600 F.2d 1193
 87 Lab.Cas. P 11,570, 1979-1 Trade Cases 62,649
 Dale McCOURT, Plaintiff-Appellee,
v.
CALIFORNIA SPORTS, INC., and the Los Angeles Kings, Inc.,
Defendants-Appellants.
Dale McCOURT, Plaintiff-Appellee,
v.
CALIFORNIA SPORTS, INC., et al., Defendants,
National Hockey League, Defendant-Appellant.
Dale McCOURT, Plaintiff-Appellee,
v.
CALIFORNIA SPORTS, INC., et al., Defendants,
National Hockey League Players' Association, Defendant-Appellant.
 Nos. 78-1462 to 78-1464.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 19, 1978.
Decided May 22, 1979.
Rehearing Denied June 27, 1979.
 
 Avern Cohn, William G. Christopher, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Richard M. Mosk, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for defendants-appellants in No. 78-1462.
 Laurence D. Connor, Roger K. Timm, Dykema, Gossett, Spencer, Goodnow & Trigg, John A. Entenman, Ted T. Amsden, Detroit, Mich., Brian M. Smith, Brian M. Smith & Associates, P.C., Troy, Mich., for plaintiff-appellee.
 Fred W. Freeman, Kenneth J. McIntyre, Dickenson, Wright, McKean, Cudlip & Moon, Detroit, Mich., Harry L. Shniderman, Bingham B. Leverich, Covington & Burling, Washington, D.C., for defendant-appellant in No. 78-1463.
 Joseph A. Sullivan, Bodman, Longley & Dahling, Detroit, Mich., Lawrence Latto, Benjamin Boley, Shea & Gardner, Wendy S. White, Washington, D.C., for defendant-appellant in No. 78-1464.
 Before EDWARDS, Chief Judge, and ENGEL and MERRITT, Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 The reserve system,[1] in professional athletics, has been the subject of exhaustive and spirited discussion both in the sports and in the legal world. Its supporters urge that it stimulates athletic competition between the teams of a sports league; its opponents urge that it stifles economic competition among those same teams. We have no doubt that there is a measure of truth in both claims.
 
 I. NHL RESERVE SYSTEM
 
 2
 Involved in this appeal is the validity, under federal antitrust laws, of the reserve system currently in effect in the National Hockey League. In its present form, the system has been termed a "modified Rozelle Rule" because it closely resembles the rule promulgated for the National Football League by its commissioner, Pete Rozelle, but has been modified to the extent that arbitration is not by the commissioner himself but by a professional and independent arbitrator.
 
 
 3
 At the heart of the NHL reserve system is By-Law Section 9A, which is attached as Appendix A. This section provides the rules governing the acquisition of free agents of other clubs in the league and is specifically made applicable to the players in the league by paragraphs 17 and 18 of the Standard Players Contract,[2] which each player in the NHL is required to sign. Further, the Standard Players Contract, expressly including Paragraph 17, was approved by both the NHL team owners and the National Hockey League Players Association (NHLPA) in the current collective bargaining agreement, Sections 9.03(a) and (b).[3]
 
 
 4
 As can be seen from its terms, By-Law Section 9A mandates that when a player becomes a free agent and signs a contract with a different club in the league, his original club has the right under the By-Law to exact an "equalization payment" from the acquiring club. That payment may be by the assignment of contracts of players, by the assignment of draft choices, or "as a last resort," by the payment of cash. If mutual agreement is not reached, each club submits a proposal to a neutral arbitrator, selected by majority vote of the Board of Governors of the League, who then must select, without change, one of the two proposals submitted.
 
 II. THIS LITIGATION
 
 5
 On October 10, 1977, Dale McCourt, a 21-year-old hockey player from Canada, signed a NHL Standard Players Contract (1974 form) with the Detroit Hockey Club, Inc. to play professional hockey for three years with the Detroit Red Wings.[4] McCourt was to be paid $325,000 over three years. He subsequently played his rookie year, 1977-78, with the Red Wings and was the leading scorer.
 
 
 6
 Rogatien Vachon had been a star goaltender for the Los Angeles Kings for six years when he became a free agent in 1978. After rejecting a substantial offer by the Kings, Vachon entered into a contract with the Red Wings at a salary of $1,900,000 for five seasons. By signing Vachon, the Red Wings obligated itself to make an equalization payment under By-Law Section 9A to the Kings and, when no agreement was reached, each club submitted to arbitrator Houston a proposal pursuant to By-Law Section 9A.8. The Red Wings offered two of its players as compensation and the Kings proposed that McCourt's contract be assigned to it. The arbitrator selected the Kings' proposal and accordingly, the Red Wings assigned McCourt's contract to Los Angeles. Rather than report to the Kings, however, Dale McCourt brought suit in the United States District Court for the Eastern District of Michigan.
 
 
 7
 Named as defendants in that suit were the National Hockey League, the Los Angeles Kings, the National Hockey League Players Association, and the Detroit Red Wings. Count I of McCourt's complaint alleged that the reserve system, and consequently the assignment of his contract to the Los Angeles Kings as the compensation for free agent Vachon, violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and sought injunctive relief under Sections 4 and 10 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (1976), to prevent the defendants from enforcing the arbitration award and to require that his contract be reassigned to the Detroit Red Wings.[5]
 
 
 8
 On September 19, 1978, following an extensive evidentiary hearing, the district court entered a preliminary injunction restraining the defendants from enforcing the arbitration award and from penalizing McCourt for refusing to play professional hockey with the Los Angeles Kings pursuant to the award. This appeal followed.[6]
 
 
 9
 In an opinion accompanying the preliminary injunction and reported at 460 F.Supp. 904, the district judge held that By-Law Section 9A unreasonably restrains trade in commerce, in violation of Section 1 of the Sherman Act:
 
 
 10
 Like the "Rozelle Rule," bylaw 9A applies to all players without regard to status or ability; it applies to the average player and to the superstar alike; it is unlimited in duration and acts as a perpetual restriction upon a player's ability to freely contract for his services. Bylaw 9A cannot be justified by any legitimate business purpose to achieve the NHL's announced goal of maintaining competitive balance. It inhibits and deters teams from signing free agents, decreases a player's bargaining power in negotiations, denies players the right to sell their services in a free and open market, and it depresses salaries more than if competitive bidding were allowed. Thus, we conclude that plaintiff has sufficiently established that bylaw 9A, as applied, unreasonably restrains trade and commerce and is violative of Section 1 of the Sherman Act. See Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976).
 
 
 11
 460 F.Supp. at 907 (footnote omitted).
 
 
 12
 Having thus ruled, the trial judge went on to hold that the defendants were not entitled to the benefit of the non-statutory labor exemption from antitrust sanctions because "(t)he preponderance of evidence . . . establishes that bylaw 9A was not the product of bona fide arm's length bargaining over any of its anticompetitive provisions. The evidence establishes that the bylaw was unilaterally imposed upon the NHLPA and was incorporated into the collective bargaining agreement in the identical language it contained when it was first adopted by the League." 460 F.Supp. at 910.
 
 III. ANTITRUST LIABILITY
 
 13
 While the Supreme Court has ruled that other professional sports do not enjoy the unique exemption from antitrust laws which has historically been reserved for the game of baseball, Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972), it has never directly ruled upon whether the reserve system common to most professional athletics comes within the ban of the Sherman Act, nor has it expressly determined whether the reserve system is a mandatory subject of collective bargaining and, therefore, exempt under federal labor policy from the operation of the federal antitrust laws.[7]
 
 
 14
 Assuming without deciding that reserve systems such a those here are subject to Section 1 of the Sherman Act and could otherwise be violative of it, we proceed to determine whether the non-statutory labor exemption applies upon the facts here.
 
 IV. LABOR EXEMPTION
 A. Legal Standards
 
 15
 The trial court and the parties before us in this appeal have all relied upon Mackey as properly enunciating the governing principles in determining whether the non-statutory labor exemption applies to the reserve system provisions of a collective bargaining agreement in professional sports. Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), Cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). There Judge Lay set forth three broad principles:
 
 
 16
 We find the proper accommodation to be: First, the labor policy favoring collective bargaining may potentially be given pre-eminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. See Connell Co. v. Plumbers & Steamfitters, supra (421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)); Meat Cutters v. Jewel Tea, supra (381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)); Mine Workers v. Pennington, supra (381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining. See Meat Cutters v. Jewel Tea, supra; Mine Workers v. Pennington, supra. Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining. See Meat Cutters v. Jewel Tea, supra. See also Smith v. Pro-Football, 420 F.Supp. 738 (D.D.C.1976); Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462, 496-500 (E.D.Pa.1972); Boston Professional Hockey Ass'n, Inc. v. Cheevers, 348 F.Supp. 261, 267 (D.Mass.), Remanded on other grounds, 472 F.2d 127 (1st Cir. 1972).
 
 
 17
 543 F.2d at 614-15 (footnotes omitted).
 
 
 18
 We see no reason to disagree with the judgment of the district court and of the attorneys on both sides that the proper standards are set out in Mackey. In short, it was proper to apply Mackey's standards; the issue is whether those standards were properly applied.
 
 B. Application of legal standards
 
 19
 We have little difficulty in determining that the first two policy considerations favor the exemption. Clearly here the restraint on trade primarily affects the parties to the bargaining relationship. It is the hockey players themselves who are primarily affected by any restraint, reasonable or not.[8] Second, the agreement concerning the reserve system involves in a very real sense the terms and conditions of employment of the hockey players both in form and in practical effect. As Mackey correctly points out, the restriction upon a player's ability to move from one team to another within the league, the financial interest which the hockey players have and their interest in the mechanics of the operation and enforcement of the rule strongly indicate that it is a mandatory bargaining subject within the meaning of the National Labor Relations Act, Section 8(d), 29 U.S.C. § 158(d) (1976).
 
 
 20
 The issue, therefore, in our judgment is narrowed to whether, upon the facts of this case, the agreement sought to be exempted was the product of bona fide arm's-length bargaining. The court in Mackey held under the circumstances before it that such arm's-length bargaining was missing. So did the district court here. The underlying facts in the two cases, however, are quite different.
 
 
 21
 In Mackey it was shown that the National Football League Players Association, at least prior to 1974, had stood in a relatively weak position with respect to the clubs. The Rozelle Rule had remained unchanged in form since it was unilaterally promulgated in 1963, even before the Players Association was formed. The Eighth Circuit specifically found that the Rozelle Rule was not bargained over in the negotiations leading to the 1968 or 1970 collective bargaining agreements:
 
 
 22
 At the outset of the negotiations preceding the 1968 agreement, the players did not seek elimination of the Rozelle Rule but felt that it should be modified. During the course of the negotiations, however, the players apparently presented no concrete proposals in that regard and there was little discussion concerning the Rozelle Rule. At trial, Daniel Shulman, a bargaining representative of the players, attributed their failure to pursue any modifications to the fact that the negotiations had bogged down on other issues and the union was not strong enough to persist.
 
 
 23
 The 1968 agreement incorporated by reference the NFL Constitution and Bylaws, of which the Rozelle Rule is a part. Furthermore, it expressly provided that free agent rules shall not be amended during the life of the agreement.
 
 
 24
 At the start of the negotiations leading up to the 1970 agreement, it appears that the players again decided not to make an issue of the Rozelle Rule. The only reference to the Rule in the union's formal proposals presented at the outset of the negotiations was the following:
 
 
 25
 The NFLPA is disturbed over reports from players who, after playing out their options, are unable to deal with other clubs because of the Rozelle Rule. A method should be found whereby a free agent is assured the opportunity to discuss contract with all NFL teams.
 
 
 26
 There was little discussion of the Rozelle Rule during the 1970 negotiations.
 
 
 27
 543 F.2d at 612-13.
 
 
 28
 Upon the expiration of the 1970 agreement, however, the NFL players obviously found themselves in a much stronger bargaining position than they previously enjoyed. Although the court in Mackey was not concerned with the 1974 collective bargaining negotiations, it noted that:
 
 
 29
 (s)ince the beginning of the 1974 negotiations, the players have consistently sought the elimination of the Rozelle Rule. The NFLPA and the clubs have engaged in substantial bargaining over that issue but have not reached an accord.
 
 
 30
 543 F.2d at 613.
 
 
 31
 Regarding these 1974 negotiations, of particular interest is the Eighth Circuit's subsequent opinion in Reynolds v. National Football League, 584 F.2d 280 (8th Cir. 1978). Reynolds developed when the National Football League Players Association in a class action sought damages and other relief for the alleged injury caused by the anti-competitive effects of the Rozelle Rule, which had earlier been outlawed in Mackey. A settlement of the class action in the district court had been contested by 15 dissenting football players who challenged the validity of the settlement reached. In upholding the settlement, the Eighth Circuit expressly noted that it had been the subject of collective bargaining. The settlement included not only cash payments but a modification of the Rozelle Rule, particularly with a better and refined formula for determining the compensation to be paid the old club when a free agent player is signed by a new club. Reynolds, therefore, represents a reaffirmation of the Eighth Circuit's holding in Mackey:
 
 
 32
 We emphasize today, as we did in Mackey, supra, that the subject of player movement restrictions is a proper one for resolution in the collective bargaining context. When so resolved, as it appears to have been in the current collective bargaining agreement, the labor exemption to antitrust attack applies, and the merits of the bargaining agreement are not an issue for court determination. The bargaining agreement is subject to change from time to time as it expires and is up for renegotiation.
 
 
 33
 584 F.2d at 289.
 
 
 34
 Returning to the area of professional hockey, we find its history well chronicled by Judge Higginbotham in Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972). The district judge's opinion in the instant case picks up the history of the reserve system and the National Hockey League where Judge Higginbotham left it in Philadelphia World Hockey Club, Inc. The district judge here stated:
 
 
 35
 Mr. John Ziegler, President of the National Hockey League, testified that in March 1973, after discussions between the NHL and the NHLPA, the Board of Governors authorized a special committee to negotiate a new reserve clause. NHL Exh. 1 at 2-4. At a meeting on March 19, 1973, the owners and player representatives tentatively agreed upon a new reserve clause pending ratification by the players. NHL Exh. 2 at 3. The tentative agreement provided, among other things, that a player with five or more years in the NHL could elect to become a free agent. See NHL Exh. 3 for the full text of the proposed reserve clause. In June 1973, the NHLPA rejected the proposed reserve clause. Thereafter, the NHLPA, on advice of counsel, refused to attend a meeting on August 28, 1973 to further discuss the proposed reserve clause. Plaintiff Exh. 2 at 3. The NHLPA elected instead to await the final outcome of the World Hockey Association's suit attacking the old reserve clause. See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., supra. When the positions of the parties solidified, the NHL unilaterally adopted bylaw 9A on November 27, 1973. Plaintiff Exh. 2 at 3.
 
 
 36
 Several months later, in February 1974, the district court approved a consent decree in the World Hockey Association suit. The NHLPA then threatened to file its own antitrust action to challenge the validity of bylaw 9A. To forestall that suit, the NHL agreed on July 9, 1975, that it would not assert laches or equitable estoppel as a defense. See Plaintiff Exh. 3 at 1; Exh. 4 at 1. At a subsequent meeting, on August 13, 1975, Mr. Ackerman, counsel for the NHL, implied that there would be no collective bargaining agreement until the dispute over bylaw 9A was resolved. The NHLPA, however, persisted in its refusal to negotiate on the clause. Plaintiff Exh. 5 at 1-2. The NHLPA's threat of an antitrust suit did not alter the NHL's firm position on bylaw 9A. On August 15, 1975, the members of the owner-players' council were advised that:
 
 
 37
 Mr. Eagleson stated that the commencement of this type of action was still being considered. I replied that decision was, of course, up to them, but that the owners would not negotiate from fear of that possibility. Pl.Exh. 5 at 2.
 
 
 38
 On May 4, 1976, the NHL and the NHLPA signed their first collective bargaining agreement retroactive from September 15, 1975. Collective Bargaining Agreement (CBA) § 2.01. The collective bargaining agreement provides that paragraph 17 of the Standard Player's Contract and bylaw 9A are "fair and reasonable terms of employment." CBA § 9.03(b).
 
 
 39
 460 F.Supp. at 910-11.
 
 
 40
 We believe that in holding that the reserve system had not been the subject of good faith, arm's-length bargaining, the trial court failed to recognize the well established principle that nothing in the labor law compels either party negotiating over mandatory subjects of collective bargaining to yield on its initial bargaining position. Good faith bargaining is all that is required. That the position of one party on an issue prevails unchanged does not mandate the conclusion that there was no collective bargaining over the issue.[9] NLRB v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).
 
 
 41
 In a case where the collective bargaining negotiations proceeded much like those on By-Law Section 9A, our circuit followed American National Insurance Co. to hold that good faith bargaining did not require the employer to alter its position. NLRB v. United Clay Mines Corp., 219 F.2d 120 (6th Cir. 1955). There the NLRB sought enforcement of its order directing the company to bargain collectively with the union. The court refused, holding:
 
 
 42
 In the present case, the respondent promptly met with the Union at its request, and interposed no objections or delays to later meetings whenever requested by the Union. Its negotiators were fully authorized to act. It submitted a proposed contract which it was willing to execute. The Union's proposals and its own proposals were discussed in detail in lengthy sessions. From the start respondent made its position clear that it would insist upon certain provisions, which, in its opinion, were basically important to the continued successful operation of the Company, such as the unqualified no-strike clause and settlement of grievances by Company management without compulsory arbitration. The Company's position on these issues was not acceptable to the Union. The Union's counterproposals on these issues were not acceptable to the Company. The negotiations, after a period of months, finally resulted in a tentative agreement with respect to all matters except the settlement of grievances. The failure to execute a contract was not because of a failure or refusal to negotiate, but in the final analysis was because the parties would not agree on one remaining issue, considered by both of them as basically important. To say that the Company should have accepted the Union's proposal on this issue is to ignore the language of the statute that the obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession."
 
 
 43
 The board also stresses the fact that the Company refused to submit alternate proposals about the grievance issue at the request of the Union after it had refused to accept the Company's original proposal, and that the inflexible attitude of the Company contributed nothing to the success of the negotiations. But the statutory right to decline to make a concession includes the right to firmly stand on a proposal previously made and not accepted.
 
 
 44
 In our opinion, the matter resolves itself into purely a question of hard bargaining on the part of the respondent. It is not for the Board or the Court to determine what in their opinion the respondent should have agreed to, and, in effect, make the contract for the parties. To decree enforcement of the order, would, as a practical matter, force the respondent to make a concession or be proceeded against for contempt of court. While the Act compels negotiations, which usually result in reaching an agreement, it contains no authority to force an agreement where the parties have reached an impasse. N. L. R. B. v. American Nat. Ins. Co., supra; N. L. R. B. v. Landis Tool Co., 3 Cir., 193 F.2d 279; N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 195 F.2d 632.
 
 
 45
 219 F.2d at 125-26. See also Fetzer Television, Inc. v. NLRB, 317 F.2d 420 (6th Cir. 1963).[10]
 
 As the Fifth Circuit succinctly observed:
 
 46
 If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system . . . of free collective bargaining.
 
 
 47
 NLRB v. Herman Sausage Co., 275 F.2d 229, 231 (5th Cir. 1960).
 
 
 48
 Contrary to the trial judge's conclusion, the very facts relied upon by him in his opinion illustrate a classic case of collective bargaining in which the reserve system was a central issue. It is apparent from those very findings that the NHLPA used every form of negotiating pressure it could muster. It developed an alternate reserve system and secured tentative agreement from the owner and player representatives, only to have the proposal rejected by the players. It refused to attend a proposed meeting with the owners to discuss the reserve system further. It threatened to strike. It threatened to commence an antitrust suit and to recommend that the players not attend training camp.[11]
 
 
 49
 For its part, the NHL, while not budging in its insistence upon By-Law Section 9A, at least in the absence of any satisfactory counter proposal by the players, yielded significantly on other issues.[12] It agreed as a price of By-Law Section 9A to the inclusion in the collective bargaining agreement of a provision that the entire agreement could be voided if the NHL and the World Hockey Association should merge. The undisputed reason for this provision was player concern that with a merger of the two leagues, the reserve system would be rendered too onerous because the players would, by the merger, lose the competitive advantage of threatening to move to the WHA. Likewise, the NHL team owners obtained a provision voiding the entire agreement should the reserve system be invalidated by the courts.[13]
 
 
 50
 The trial court, while acknowledging that the new collective bargaining agreement contained significant new benefits to the players, held that they were not "directly related to collective bargaining on bylaw 9A." This observation and the trial court's conclusion that "the NHLPA never bargained for bylaw 9A in the first instance" typifies its approach. It is true that the NHLPA did not "bargain for" By-Law Section 9A; it bargained "against" it, vigorously. That the trial judge concluded the benefits in the new contract were wrung from management by threat of an antitrust suit to void the By-Law merely demonstrates that the benefits were bargained for in connection with the reserve system, although he opined that the threat of a suit was a more effective bargaining tool than the threat of a strike. And while we agree with the trial judge that inclusion of language in the collective bargaining agreement that the reserve system provisions were "fair and reasonable" would not immunize it from antitrust attack, it is manifest from the entire facts found by the court that there was no collusion between management and the players association. Thus, the trial court found that "(t)he NHLPA agreed to include bylaw 9A in the collective bargaining agreement only after the NHL conceded that the NHLPA could terminate the entire agreement if the NHL merged with the World Hockey Association." 460 F.Supp. at 911. The trial court also credited the testimony of John Ziegler that "the owners took a strong stand toward equalization, that they believed bylaw 9A was fair, and that they wanted it incorporated into the collective bargaining agreement. . . ." Finally, the trial court found that "(t)he NHLPA's acceptance of bylaw 9A was essential to get the parties off dead center. The players had no other alternative. The Standard Player's Contract required them to accept all the bylaws adopted by the NHL." 460 F.Supp. at 911.
 
 
 51
 From the express findings of the trial court, fully supported by the record, it is apparent that the inclusion of the reserve system in the collective bargaining agreement was the product of good faith, arm's-length bargaining, and that what the trial court saw as a failure to negotiate was in fact simply the failure to succeed, after the most intensive negotiations, in keeping an unwanted provision out of the contract. This failure was a part of and not apart from the collective bargaining process, a process which achieved its ultimate objective of an agreement accepted by the parties.
 
 V. CONCLUSION
 
 52
 Assuming without deciding that the reserve system incorporated in the collective bargaining agreement was otherwise subject to the antitrust laws, whether the good faith, arm's-length requirement necessary to entitle it to the non-statutory labor exemption from the antitrust laws applies is to be governed by the developed standards of law applicable elsewhere in the field of labor law and as set forth in Mackey, supra. So viewed, the evidence here, as credited by the trial court, compels the conclusion that the reserve system was incorporated in the agreement as a result of good faith, arm's-length bargaining between the parties. As such it is entitled to the exemption, and the trial court's conclusion to the contrary must be deemed clearly erroneous.
 
 
 53
 The injunction is vacated, and the cause remanded for entry of judgment in favor of defendants upon Count I of the complaint. The cause is also remanded for further proceedings not inconsistent herewith.
 
 
 54
 No costs.
 
 APPENDIX A
 NATIONAL HOCKEY LEAGUE BY-LAW SECTION 9A
 FREE AGENTS AND EQUALIZATION
 
 55
 (Adopted November 27, 1973)
 
 Free Agents
 
 56
 9A. 1. A player who becomes a "free agent" pursuant to subsections 2 or 3 of this By-Law shall have the right to negotiate and contract with any Member Club or with any club in any other league.
 
 
 57
 9A. 2. A player who enters into a 1974 Form Standard Player's contract shall have the right to become a free agent in accordance with the terms of Section 17 of said contract and in accordance with the Player's Option contract to which said Section 17 refers.
 
 
 58
 9A. 3. Any other player under contract to any Member Club on the date this By-Law is adopted, the final year of whose contract ends on or after September 30, 1974, shall become a free agent on June 1 of the final year of that contract, except that any such player whose contract is a 1972 Form Standard Player's contract whose final year ends on September 30, 1974, shall become a free agent on June 1, 1975. For purposes of this subsection 3, the "final year" of a contract shall be the last year of its fixed term specified in Section 1 of said contract, including, however, any period added to that term by any addendum or exercised special option contracted for by the Member Club and player.
 
 
 59
 9A. 4. The foregoing subsection 3 shall not be construed to derogate in any way from the rights of any player under any contract but constitutes instead a waiver of any and all rights by each Member Club under the contracts to which said subsection is applicable to require the services of players for periods beyond those set out in said subsection.
 
 Free Agent List
 
 60
 9A. 5. On or before May 15 in each year each Member Club shall deliver to the President a report in writing, by TWX, telegram or by mail, (which report shall remain confidential until the issuance of the Free Agent List described below), setting forth the name of each player under contract to it who, unless signed to a new contract with said Club prior to June 1 of that year, will become a free agent as of that date. Each Member Club shall also furnish to the President after May 15 of such year, by immediate TWX or telegram, information as to any change of status of any such player. The President shall, on June 1 of such year, issue to all Member Clubs a Free Agent List setting forth the names of all players he finds to be free agents as of such date, together with the name of the Member Club with which each such player was last under contract, and shall thereafter promptly issue such bulletins correcting, amending, or updating such list as may be necessary to ensure its accuracy and currency. Except during a period that a player's name remains on the Free Agent List, no Member Club other than the Club with which he was last under contract may sign a contract or negotiate with such player, directly or indirectly, without the prior written consent of the Member Club with which he was last under contract, or otherwise take any action which would violate Section 15 of these By-Laws.
 
 Obligation to make equalization payment
 
 61
 9A. 6. Each time that a player becomes a free agent and the right to his services is subsequently acquired by any Member Club other than the club with which he was last under contract or by any club owned or controlled by any such Member Club, the Member Club first acquiring the right to his services, or owning or controlling the club first acquiring that right, shall make an equalization payment to the Member Club with which such player was previously under contract, as prescribed by subsection 8 of this By-Law. Each Member Club may acquire the right to the services of as many free agents as it wishes, subject to the provisions of subsection 9 of this By-Law.
 
 Determination of Equalization Payment
 Purpose
 
 62
 9A. 7. The purpose of the equalization payment shall be to compensate a player's previous Member Club fairly for loss of the right to his services when that player becomes a free agent and the right to his services is acquired by another Member Club or a club owned or controlled by another Member club.
 
 Procedure
 
 63
 9A. 8. (a) The Member Club acquiring the services of a free agent, or owning or controlling the club acquiring such services, shall immediately notify the player's previous Member Club and the President of that fact by TWX or telegram. The equalization payment shall be determined, if possible, by mutual agreement of the two Member Clubs involved. If no such agreement is reached within three business days after the date on which the player's services are acquired, each of the Member Clubs involved shall within two additional business days submit by TWX or telegram its proposal for an equalization payment to a neutral arbitrator selected from time to time by majority vote of the Board of Governors of the League.
 
 
 64
 9A. 8. (b) Within two business days after the deadline for receipt of the Clubs' proposals, the arbitrator shall, unless notified by both Clubs in writing, by TWX or by telegram that they have reached agreement on the equalization payment, select without change one of the proposals submitted to him, and his determination shall be final and not subject to review.
 
 
 65
 9A. 8. (c) The Clubs' proposals and the arbitrator's determination of equalization must be limited to:
 
 
 66
 (i) the assignment of a contract or contracts for the services of a player or players binding upon such player or players for at least the next season; and/or
 
 
 67
 (ii) choices in any intra-league, inter-league and/or amateur drafts to be held at any time subsequent to such proposal and/or unsigned draft choices or negotiation nominees; and/or
 
 
 68
 (iii) cash.
 
 
 69
 In making his selection the arbitrator shall be governed by the policy that cash shall be used for equalization purpose only as a last resort.
 
 
 70
 9A. 8. (d) The contracts of all players under contract to the acquiring Club at the time a free agent is acquired shall be available for equalization purposes.
 
 
 71
 9A. 8. (e) The cost of the arbitrator shall be borne by the League.
 
 
 72
 9A. 8. (f) To facilitate a good faith effort to reach agreement on the equalization payment, the acquiring Club shall furnish to the Club entitled to that payment such information as may reasonably be required with respect to any player the assignment of whose contract is proposed by either party as an equalization payment, in whole or in part, including, but not limited to, the salary, bonus, and other compensation of such player, a copy of the player's contract, and any adverse information with respect to the physical, mental, or emotional condition of such player.
 
 
 73
 9A. 8. (g) The details of the procedure to be followed in the event arbitration is required shall be set forth in the agreement entered into by the League and the arbitrator.
 
 Satisfaction of Equalization Obligation
 
 74
 9A. 9. No Member Club, or any club owned or controlled by such Member Club, shall be entitled to sign or acquire the right to the services of any free agent until it has satisfied in full its equalization obligation under these By-Laws as to each other free agent, the right to whose services it has acquired, by assigning the player contracts and/or draft rights and otherwise consummating the equalization payment required by mutual agreement or by arbitration. It shall be the responsibility of the acquiring Club to notify the President that it has satisfied its equalization obligation.
 
 
 75
 9A. 10. The President shall disallow the right of any acquiring Member Club to use the services of any signed free agent if he has not received the notice specified in subsection 9 or otherwise finds that the equalization payment for that player or for any other free agent previously signed has not been fully satisfied by said Member Club in accordance with this By-Law.
 
 
 76
 EDWARDS, Chief Judge, dissenting.
 
 
 77
 I respectfully dissent. My basic disagreement with the majority opinion is planted on the proposition that if sports clubs organized for profit are to be exempted from the antitrust laws, this should be accomplished by statutory amendment, in accordance with the Constitution of the United States. Any such amendment would necessarily follow extensive hearings on the possible implications of the exemption, not only on organized sports, but also on the whole of the American economy a process not available to the Judicial Branch.
 
 
 78
 The essence of the restriction on competition involved in this case is an agreement between all National Hockey League clubs not to hire any hockey player who has become a free agent (by refusing reemployment contract terms offered by his previous club) without undertaking to "equalize" the loss to his former club by agreed on or arbitrated transfer of players or cash.[1]
 
 
 79
 The restriction by its terms is upon the NHL constituent clubs. Its impact, however, is clearly upon star hockey players. Clause 9A.6 obviously diminishes the hockey star's bargaining power, both with his previous employer and any prospective employer. It also may require any player who is transferred under the equalization clause to live in a city and play for a club against his professional (or private) best interests.
 
 
 80
 The legal question posed by this case is whether an association of employers may in the organized sports industry (here it is hockey) gain exemption from the antitrust laws for an agreement among themselves to restrict otherwise free competition in employment of hockey players by imposing their employer-devised agreement upon a union representing that class of employees through use of economic inducement or compulsion. Before we give judicial sanction to such a practice as consistent with the antitrust and labor-management laws of this country, we should take a long, hard look at the implications for sections of the national economy other than organized sports.
 
 
 81
 Superstars whose services are at a high premium can be found in many areas of industry and commerce other than the world of sports. Is there any distinction to be drawn between Clause 9A and similar restrictions in, for example, the field of dress manufacturing for the services of highly talented designers, or in the metalworking industries for the services of highly talented engineers, designers, or die shop leaders, or the entertainment field for highly talented personnel, or in the publishing field for highly talented writers?
 
 
 82
 Such a restriction on freedom of competition (and human freedom in choice of employment) in the interest of promotion or maintenance of business profits, has a distinctly predatory ring. While the majority opinion declines to answer the question as to whether, without benefit of an exemption, Clause 9A would be violative of the Sherman Act, I believe that 9A does violate the antitrust laws and that no "labor union exemption" or nonstatutory exemption is applicable.
 
 
 83
 The most distinguishing feature of the economy of the United States is the statutory prohibition upon monopoly and upon contracts and devices designed to restrict free competition. Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1976); Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (1976). Through many decades Congress has adhered to a legal ban upon such practices.
 
 
 84
 The first and crucial sentence of the Sherman Act is sweeping. It provides:
 
 
 85
 S 1. Trusts, etc., in restraint of trade illegal; penalty
 
 
 86
 Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .
 
 
 87
 15 U.S.C. § 1 (1976).
 
 
 88
 The Sherman Act and Clayton Act also provide:
 
 S 2. Monopolizing trade a felony; penalty
 
 89
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 90
 S 4. Jurisdiction of courts; duty of United States attorneys; procedure
 
 
 91
 The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.
 
 
 92
 S 26. Injunctive relief for private parties; exception
 
 
 93
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rule governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . .
 
 
 94
 Id. at §§ 2, 4, 26.
 
 
 95
 This appeal requires us to measure Clause 9A of the National Hockey League By-Laws against the antitrust laws just quoted.
 
 Clause 9A provides:
 FREE AGENTS AND EQUALIZATION
 
 96
 (Adopted November 27, 1973)
 
 Free Agents
 
 97
 9A. 1. A player who becomes a "free agent" pursuant to subsections 2 or 3 of this By-Law shall have the right to negotiate and contract with any Member Club or with any club in any other league.
 
 
 98
 (Clauses 9A2 thru 9A5 omitted. See Appendix to Majority Opinion.)
 
 Obligation to make equalization payment
 
 99
 9A. 6. Each time that a player becomes a free agent and the right to his services is subsequently acquired by any Member Club other than the club with which he was last under contract or by any club owned or controlled by any such Member Club, the Member Club first acquiring the right to his services, or owning or controlling the club first acquiring that right, shall make an equalization payment to the Member Club with which such player was previously under contract, as prescribed by subsection 8 of this By-Law. Each Member Club may acquire the right to the services of as many free agents as it wishes, subject to the provisions of subsection 9 of this By-Law.
 
 Determination of Equalization Payment
 Purpose
 
 100
 9A. 7. The purpose of the equalization payment shall be to compensate a player's previous Member Club fairly for loss of the right to his services when that player becomes a free agent and the right to his services is acquired by another Member Club or a club owned or controlled by another Member club.
 
 Procedure
 
 101
 9A. 8. (a) The Member Club acquiring the services of a free agent, or owning or controlling the club acquiring such services, shall immediately notify the player's previous Member Club and the President of that fact by TWX or telegram. The equalization payment shall be determined, if possible, by mutual agreement of the two Member Clubs involved. If no such agreement is reached within three business days after the date on which the player's services are acquired, each of the Member Clubs involved shall within two additional business days submit by TWX or telegram its proposal for an equalization payment to a neutral arbitrator selected from time to time by majority vote of the Board of Governors of the League.
 
 
 102
 (Clauses 9A8 (b) and (c) omitted. See Appendix to Majority Opinion.)
 
 
 103
 9A. 8. (d) The contracts of all players under contract to the acquiring Club at the time a free agent is acquired shall be available for equalization purposes.
 
 
 104
 9A. 8. (e) The cost of the arbitrator shall be borne by the League.
 
 
 105
 9A. 8. (f) To facilitate a good faith effort to reach agreement on the equalization payment, the acquiring Club shall furnish to the Club entitled to that payment such information as may reasonably be required with respect to any player the assignment of whose contract is proposed by either party as an equalization payment, in whole or in part, including, but not limited to, the salary, bonus, and other compensation of such player, a copy of the player's contract, and any adverse information with respect to the physical, mental, or emotional condition of such player.
 
 
 106
 9A. 8. (g) The details of the procedure to be followed in the event arbitration is required shall be set forth in the agreement entered into by the League and the arbitrator.
 
 Satisfaction of Equalization Obligation
 
 107
 9A. 9. No Member Club, or any club owned or controlled by such Member Club, shall be entitled to sign or acquire the right to the services of any free agent until it has satisfied in full its equalization obligation under these By-Laws as to each other free agent, the right to whose services it has acquired, by assigning the player contracts and/or draft rights and otherwise consummating the equalization payment required by mutual agreement or by arbitration. It shall be the responsibility of the acquiring Club to notify the President that it has satisfied its equalization obligation.
 
 
 108
 9A. 10. The President shall disallow the right of any acquiring Member Club to use the services of any signed free agent if he has not received the notice specified in subsection 9 or otherwise finds that the equalization payment for that player or for any other free agent previously signed has not been fully satisfied by said Member Club in accordance with this By-Law.
 
 
 109
 The nature of the national (and international) sports business is such that the acquisition of talented players is the essence of the business of organized sports clubs. Measures like 9A are anticompetitive agreements banning or restricting competition between clubs for players. Such clauses adopted by an already dominating league will also have the effect of restricting competition from other leagues and thus promoting monopoly.
 
 
 110
 Clauses like 9A would seem to be per se violations of Section 1 of the Sherman Act. If measured by the preferred "rule of reason," they fail the United States Supreme Court's case law tests. See Chicago Bd. of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).
 
 
 111
 Appellants' defense of 9A is cast principally in public policy argument. It runs: Star players like McCourt produce the victories and championships for the club. They also attract the paying customers and generate profits. When star players are monopolized by one club, that club gains profits at the expense of all other clubs in the league. When the star players are distributed somewhat evenly throughout the league, team competition is enhanced and the well-being of the league as a whole is protected. The result is beneficial to the league and to the league's sports-minded public.
 
 
 112
 The point of this dissent is not to disagree with this public policy argument. Congress, which adopted the antitrust laws in the first instance, may choose to exempt nationally organized sports leagues from the antitrust laws by allowing carefully devised controls over player contracts designed to prevent league imbalance. My problem is that I cannot find any rationale for this court's devising such a policy which is 1) consistent with the antitrust statutes, or 2) which could be limited to the field of sports, or 3) which is supported by decisions on antitrust issues in the United States Supreme Court.
 
 THE EXEMPTION CLAIM
 
 113
 The majority opinion relies solely upon judicial extrapolation from one of the rare exceptions to the strictures of the Sherman Act. It was adopted in 1914 and provides:
 
 
 114
 The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.
 
 
 115
 15 U.S.C. § 17 (1976).
 
 
 116
 It should be noted that the amendment applies only to organizations "not having capital stock or conducted for profit." Obviously, by its terms, the clubs of the National Hockey League are specifically excluded because they are not "labor, agricultural, or horticultural organizations," and because they do have capital stock and are organized for profit. But in fact, neither the appellants nor my colleagues in the majority rely upon the terms of the statute. What is relied upon is case law in which the federal courts have sought to reconcile the conflict between the antitrust laws (with their prohibitions against restraint of trade and antimonopoly practices) and the labor union exemption. From the beginning of this conflict it has been recognized that the very purpose of labor organization was to remove wages from the pressures which would otherwise be placed on them by cost competition between competing employers.
 
 
 117
 In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), Justice Frankfurter reviewed the history which led to the adoption of the labor union exemption:
 
 
 118
 Section 1 of the Sherman Law on which the indictment rested is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." The controversies engendered by its application to trade union activities and the efforts to secure legislative relief from its consequences are familiar history. The Clayton Act of 1914 was the result. Act of October 15, 1914, 38 Stat. 730. "This statute was the fruit of unceasing agitation, which extended over more than 20 years and was designed to equalize before the law the position of workingmen and employer as industrial combatants." Duplex Co. v. Deering, 254 U.S. 443, 484 (41 S.Ct. 172, 182, 65 L.Ed. 349). Section 20 of that Act, which is set out in the margin in full, withdrew from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them since the use of the injunction had been the major source of dissatisfaction and also relieved such practices of all illegal taint by the catch-all provision, "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." The Clayton Act gave rise to new litigation and to renewed controversy in and out of Congress regarding the status of trade unions. By the generality of its terms the Sherman Law had necessarily compelled the courts to work out its meaning from case to case. It was widely believed that into the Clayton Act courts read the very beliefs which that Act was designed to remove. Specifically the courts restricted the scope of § 20 to trade union activities directed against an employer by his own employees. Duplex Co. v. Deering, supra. Such a view it was urged, both by powerful judicial dissents and informed lay opinion, misconceived the area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts. Ibid., p. 485-486 (41 S.Ct. p. 183). Agitation again led to legislation and in 1932 Congress wrote the Norris-LaGuardia Act. Act of March 23, 1932, 47 Stat. 70, 29 U.S.C. §§ 101-115.
 
 
 119
 The Norris-LaGuardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the "public policy of the United States" in regard to the industrial conflict, and by its light established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation. Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct.
 
 
 120
 Id. at 229-31, 61 S.Ct. at 465-466 (footnotes omitted).
 
 
 121
 Subsequently, in Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court pointed out that the exemption made available to labor would be lost if it was used in connection with corporations organized for profit to aid them in controlling prices of their products and creating monopoly. In the Pennington case Justice White, speaking for the Court, reviewed the history of the exemptions created by the Clayton and Norris-LaGuardia Acts when they were sought to be employed by unions acting in concert with employers:
 
 
 122
 The antitrust laws do not bar the existence and operation of labor unions as such. Moreover, § 20 of the Clayton Act, 38 Stat. 738, and § 4 of the Norris-LaGuardia Act, 47 Stat. 70, permit a union, acting alone, to engage in the conduct therein specified without violating the Sherman Act. United States v. Hutcheson, 312 U.S. 219 (61 S.Ct. 463, 85 L.Ed. 788); United States v. International Hod Carriers Council, 313 U.S. 539 (61 S.Ct. 839, 85 L.Ed. 1508), affirming Per curiam, 37 F.Supp. 191 (D.C.N.D.Ill.1941); United States v. American Federation of Musicians, 318 U.S. 741 (63 S.Ct. 665, 87 L.Ed. 1120), affirming Per curiam, 47 F.Supp. 304 (D.C.N.D.Ill.1942).
 
 
 123
 But neither § 20 nor § 4 expressly deals with arrangements or agreements between unions and employers. Neither section tells us whether any or all such arrangements or agreements are barred or permitted by the antitrust laws. Thus Hutcheson itself stated:
 
 
 124
 "So long as a union acts in its self-interest And does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U.S., at 232 (61 S.Ct., at 466). (Emphasis added.)
 
 
 125
 And in Allen Bradley Co. v. (Local) Union (No. 3, IBEW), 325 U.S. 797 (65 S.Ct. 1533, 89 L.Ed. 1939), this Court made explicit what had been merely a qualifying expression in Hutcheson and held that "when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." Id., at 809 (65 S.Ct., at 1540). See also Brotherhood of Carpenters v. United States, 330 U.S. 395, 398-400 (67 S.Ct. 775, 778, 91 L.Ed. 973); United States v. Employing Plasterers Assn., 347 U.S. 186, 190 (74 S.Ct. 452, 98 L.Ed. 618). Subsequent cases have applied the Allen Bradley doctrine to such combinations without regard to whether they found expression in a collective bargaining agreement, Brotherhood of Carpenters v. United States, supra ; see Teamsters Union v. Oliver, 358 U.S. 283, 296 (79 S.Ct. 297, 304, 3 L.Ed.2d 312), and even though the mechanism for effectuating the purpose of the combination was an agreement on wages, see Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46 (C.A. 8th Cir. 1958), or on hours of work, Philadelphia Record Co. v. Manufacturing Photo-Engravers Assn., 155 F.2d 799 (C.A. 3d Cir. 1946).
 
 
 126
 United Mine Workers v. Pennington, supra at 661-63, 85 S.Ct. at 1589.
 
 
 127
 Justice Douglas, speaking for himself and two other Justices, concurred, but added some additional thoughts:
 
 
 128
 I repeat what we said in Allen Bradley Co. v. Union (No. 3, IBEW), supra (325 U.S.), at 811 (65 S.Ct., at 1535):
 
 
 129
 "The difficulty of drawing legislation primarily aimed at trusts and monopolies so that it could also be applied to labor organizations without impairing the collective bargaining and related rights of those organizations has been emphasized both by congressional and judicial attempts to draw lines between permissible and prohibited union activities. There is, however, one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the (Sherman) Act."
 
 
 130
 Congress can design an oligopoly for our society, if it chooses. But business alone cannot do so as long as the antitrust laws are enforced. Nor should business and labor working hand-in-hand be allowed to make that basic change in the design of our so-called free enterprise system.United Mine Workers v. Pennington, supra at 674, 85 S.Ct. at 1595-1596.
 
 
 131
 Until this case, I do not know of any instance where profitmaking businesses have succeeded in justifying a cartel arrangement which suits their purposes by dint of securing that arrangement's introduction into a collective bargaining agreement and thus acquiring the right to the "labor union exemption." The majority's approval of this arrangement in this case in fact stands the labor union exemption squarely on its head.
 
 
 132
 The District Judge heard evidence on plaintiff's complaint for a preliminary injunction so fully that the parties have now stipulated to submit the issues as if the case had been fully tried.
 
 
 133
 As to the origin of Clause 9A (the restrictive clause complained about) the District Judge found:
 
 
 134
 Finally, the defendants argue that plaintiff may not obtain preliminary injunctive relief upon his antitrust claim because they should be afforded the non-statutory labor exemption from antitrust sanctions. The preponderance of evidence, however, establishes that bylaw 9A was not the product of bona fide arm's length bargaining over any of its anticompetitive provisions. The evidence establishes that the bylaw was unilaterally imposed upon the NHLPA and was incorporated into the collective bargaining agreement in the identical language it contained when it was first adopted by the League.
 
 
 135
 Mr. John Ziegler, President of the National Hockey League, testified that in March 1973, after discussions between the NHL and the NHLPA, the Board of Governors authorized a special committee to negotiate a new reserve clause. At a meeting on March 19, 1973, the owners and player representatives tentatively agreed upon a new reserve clause pending ratification by the players. The tentative agreement provided, among other things, that a player with five or more years in the NHL could elect to become a free agent. In June 1973, the NHLPA rejected the proposed reserve clause. Thereafter, the NHLPA, on advice of counsel, refused to attend a meeting on August 28, 1973 to further discuss the proposed reserve clause. The NHLPA elected instead to await the final outcome of the World Hockey Association's suit attacking the old reserve clause. See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., supra (351 F.Supp. 462 (E.D.Pa.1972)). When the positions of the parties solidified, the NHL unilaterally adopted bylaw 9A on November 27, 1973.
 
 
 136
 Several months later, in February 1974, the district court approved a consent decree in the World Hockey Association suit. The NHLPA then threatened to file its own antitrust action to challenge the validity of bylaw 9A. To forestall that suit, the NHL agreed on July 9, 1975, that it would not assert laches or equitable estoppel as a defense. At a subsequent meeting, on August 13, 1975, Mr. Ackerman, counsel for the NHL, implied that there would be no collective bargaining agreement until the dispute over bylaw 9A was resolved. The NHLPA, however, persisted in its refusal to negotiate on the clause. The NHLPA's threat of an antitrust suit did not alter the NHL's firm position on bylaw 9A. On August 15, 1975, the members of the owner-players' council were advised that:
 
 
 137
 Mr. Eagleson stated that the commencement of this type of action was still being considered. I replied that decision was, of course, up to them, but that the owners would not negotiate from fear of that possibility.
 
 
 138
 On May 4, 1976, the NHL and the NHLPA signed their first collective bargaining agreement retroactive from September 15, 1975. Collective Bargaining Agreement (CBA) § 2.01. The collective bargaining agreement provides that paragraph 17 of the Standard Player's Contract and bylaw 9A are "fair and reasonable terms of employment." CBA § 9.03(b). Like the Eighth Circuit Court of Appeals in Mackey (Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), Cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977)), however, we find that the mere inclusion of bylaw 9A in the collective bargaining agreement cannot serve to immunize it from antitrust sanctions. The evidence offered at the hearing persuades us that the parties did not collectively bargain for bylaw 9A. Mr. Eagleson testified that:
 
 
 139
 (T)he owners made it clear that their bottom line position was non-debatable on the By-Law that they had passed and the contract that they had approved unilaterally.
 
 
 140
 He further testified that as late as August 1975, the player representatives agreed that unless further "concessions" were made by the owners, they would recommend that their teammates not attend training camp. The NHLPA agreed to include bylaw 9A in the collective bargaining agreement only after the NHL conceded that the NHLPA could terminate the entire agreement if the NHL merged with the World Hockey Association. The agreement also provided that the owners could terminate the agreement if there was a judicial determination that bylaw 9A was invalid. CBA §§ 9.03(c) and (e). Even after the collective bargaining agreement was signed, the NHLPA suggested modifications of the equalization provision. Mr. Eagleson testified that the suggested modifications would be of "great benefit" to the players, suggesting to us that the NHLPA never bargained for bylaw 9A in the first instance.
 
 
 141
 Mr. Ziegler further stated on cross-examination that although the NHL was willing to negotiate on equalization at any time, the players had to adhere to the bylaw because the Standard Player's Contract required them to adhere to all bylaws adopted by the NHL. In effect, although the owners indicated that they were willing to negotiate, the players really had no choice. Mr. Ziegler stated that the owners took a strong stand toward equalization, that they believed that bylaw 9A was fair, and that they wanted it incorporated into the collective bargaining agreement. Moreover, it is apparent that both parties to the collective bargaining agreement realized fully that bylaw 9A could not withstand judicial scrutiny.
 
 
 142
 To support its contention that bylaw 9A was collectively bargained, the NHL argues that the NHLPA received a substantial quid pro quo for agreeing to include the bylaw in the agreement. In our view, the evidence more logically supports the inference that the benefits were received as a settlement of NHLPA's threatened suit to challenge the bylaw. The NHLPA's acceptance of bylaw 9A was essential to get the parties off dead center. The players had no other alternative. The Standard Player's Contract required them to accept all the bylaws adopted by the NHL. We cannot find from this evidence that the increased pension benefits, the right for players to negotiate salaries and the right to share in the proceeds from international hockey competition are directly related to collective bargaining on bylaw 9A. The evidence suggests, for example, that the players "would not agree to (international hockey competition) . . . unless agreement was reached on their request for increased pension benefits." The bylaw was included in the collective bargaining agreement to give the impression that it was a bargained-for provision. When labor and non-labor groups combine to insert into a collective bargaining agreement a non-negotiated provision, courts will not afford either party the non-statutory labor exemption.
 
 
 143
 Thus the District Judge found these two important facts: Clause 9A originated exclusively with the National Hockey League and its member clubs, and Clause 9A was not the product of arm's length bargaining.
 
 
 144
 In my judgment this record does not afford any basis whatever for holding that any of these findings of fact and conclusions of law are without substantial evidentiary support or are clearly erroneous. This leads inevitably to the conclusion reached by the District Judge that Clause 9A is not protected by any labor exemption, either statutory or nonstatutory.
 
 THE ROZELLE RULE CASES
 
 145
 We, of course, in this case are by no means writing upon a clean tablet. The effort on the part of owners of organized sports leagues and clubs to gain control of their players began long ago and achieved its greatest legal success in Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). There "Homer nodded" as Mr. Justice Holmes, for a unanimous Court, held "The business is giving exhibitions of baseball, which are purely state affairs." Thus the great American pastime gained exemption from the antitrust laws on the theory that baseball was outside of interstate commerce. That decision has been much criticized both in the courts and in legal literature. See Flood v. Kuhn, 407 U.S. 258, 280 n. 16, 286, 291-93, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); Radovich v. National Football League, 352 U.S. 445, 450, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Salerno v. American League, 429 F.2d 1003, 1005 (2d Cir. 1970), Cert. denied sub nom., Salerno v. Kuhn, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971); Gardella v. Chandler, 172 F.2d 402, 408-09 (2d Cir. 1949). It has, however, never been overruled.
 
 
 146
 In 1972 the Supreme Court majority in an opinion authored by Mr. Justice Blackmun held that baseball's reserve clause was protected by "positive inaction" of Congress in allowing the Federal Baseball decision to stand without statutory correction. But that opinion also included a clear-cut warning to all other sports not so blessed: "other professional sports operating interstate football, boxing, basketball, and, presumably, hockey and golf are not so exempt." Flood v. Kuhn, supra, 407 U.S. at 282-83, 92 S.Ct. at 2112.
 
 
 147
 Turning from the thus historically protected great American pastime to other less fortunate sports, I simply find no authoritative support for legalizing the sort of reserve clause sought to be imposed by the National Hockey League on its players.
 
 
 148
 The majority opinion cites and quotes from Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), Cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). But there the Eighth Circuit held:
 
 
 149
 The district court found, however, that the Rule operates to restrict a player's ability to move from one team to another and depresses player salaries. There is substantial evidence in the record to support these findings. Accordingly, we hold that the Rozelle Rule constitutes a mandatory bargaining subject within the meaning of the National Labor Relations Act.
 
 
 150
 On the basis of our independent review of the record, including the parties' bargaining history as set forth above, we find substantial evidence to support the finding that there was no bona fide arm's-length bargaining over the Rozelle Rule preceding the execution of the 1968 and 1970 agreements.
 
 
 151
 Id. at 615-16.
 
 
 152
 The District Judge in this case has made a similar finding which, as noted above, I cannot on this record characterize as clearly erroneous.
 
 
 153
 The attempt to distinguish these findings and conclusions in Mackey from those of the District Court in our instant case seems completely unpersuasive to me.
 
 
 154
 The majority opinion seems to argue that Mackey's holding that the Rozelle rule violated the Sherman Act was reversed in effect by a settlement between the National Football League and the Players' Association. A voluntary settlement of a lawsuit after remand for trial does not diminish the legal value of the remanding opinion. The Mackey case, in my judgment, stands squarely in favor of the result reached by the District Court in this case and is by no means weakened as precedent by a settlement arrived at during subsequent litigation. See Reynolds v. National Football League, 584 F.2d 280 (8th Cir. 1978). Perhaps in this present case also, if it were remanded, the parties might reach a settlement on less restrictive conditions than those shown herein. No judgment can be made in advance as to whether such conditions would satisfy the antitrust laws.
 
 
 155
 The majority opinion also quotes from now Circuit Judge Leon Higginbotham's excellent District Court opinion in Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972). As set forth below, however, Judge Higginbotham specifically held that "the National Hockey League cannot invoke the labor exemptions and is thus subject to a prosecution under the Sherman Act." Id. at 500.
 
 He also concluded:
 
 156
 In providing a special exemption from Sherman Act regulations for labor unions and employers who in good faith negotiated with those unions, Congress attempted to accommodate what frequently were conflicting public policies: the fostering and preservation of competitive business conditions in a free enterprise system on one hand, counterbalanced by a legitimate concern in improving and bettering the working conditions of laborers and the reduction of industrial strife through vigorous union organization and collective bargaining. The labor exemption which could be defensively utilized by the union and employer as a shield against Sherman Act proceedings when there was bona fide collective bargaining, could not be seized upon by either party and destructively wielded as a sword by engaging in monopolistic or other anti-competitive conduct. The shield cannot be transmuted into a sword and still permit the beneficiary to invoke the narrowly carved out labor exemption from the anti-trust laws. To allow and condone such conduct would frustrate Congress' carefully orchestrated efforts to harmoniously blend together two opposing public policies.
 
 
 157
 Id. at 499-500.
 
 THE RULE OF REASON
 
 158
 In the Mackey case the District Court had held that the Rozelle rule represented a per se violation of the Sherman Act. The Eighth Circuit was not so sure. As a consequence, its opinion weighed the Rozelle rule under the "Rule of Reason" standard and concluded, "We hold that restraints on competition within the market for players' services fall within the ambit of the Sherman Act." Mackey, supra at 618. Assuming that "it (is) more appropriate to test the validity of the Rozelle Rule under the Rule of Reason," Mackey, supra at 620, I agree with the analysis of the Eighth Circuit opinion which did not find any legitimate business purpose for the restraints imposed by the Rozelle rule but also held that there were other less onerous (and legally less dubious) methods of achieving reasonable competitive balance in the National Football League. (See pp. 1217-1218 of this opinion)
 
 
 159
 The kind of restrictions sought to be applied there and here are anti-competitive in purpose and anti-competitive in effect. They are not novel and have frequently been found violative of the antitrust laws in the courts. Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), Cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972); Robertson v. National Basketball Ass'n, 389 F.Supp. 867 (S.D.N.Y.1975); Smith v. Pro-Football, 420 F.Supp. 738 (D.D.C.1976), Aff'd, 593 F.2d 1173 (D.C. Cir. 1978).
 
 MANDATORY BARGAINING
 
 160
 I do reject one feature of the Mackey and Reynolds decisions upon which the majority relies. The fact that a particular provision restricting competition is a mandatory subject of collective bargaining and has been agreed upon by management and labor in a collective bargaining contract does not necessarily exempt the restriction from the Sherman Act. The antitrust laws were adopted to protect the free enterprise system and the general public. It is easy to postulate situations where the profit interests of capital and the wage-hour interests of labor could be mutually served by introducing into collective bargaining agreements restrictions upon competition which are greatly contrary to the public interest and have nothing to do with the labor interests protected by the Clayton and Norris-LaGuardia Acts. In two instances where there was labor-management agreement (albeit not in the written contracts), the Supreme Court struck down the restrictive practices. Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).
 
 
 161
 In the Pennington case, as we have previously noted, Justice White, in the opinion of the Court, noted that in Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947), the Supreme Court had applied the Allen Bradley doctrine (barring any exemption) without regard to whether the restrictive practice found expression in a collective bargaining agreement.
 
 
 162
 It should also be noted that what is proposed here is light years removed from the controversy which divided the Court in United Mine Workers v. Pennington as far as origin and purpose of the restrictive practices here involved are concerned. Nonetheless, it is relevant to the legal posture of this case to note that three Justices dissented in the Pennington case, arguing at least in part that because the wage-hour issues in Pennington were mandatory subjects for bargaining, these issues should be exempt from the antitrust laws. The majority of the Court rejected this specific contention. I am unable to find any Supreme Court authority which may properly be cited for any employment of the labor exemption or the nonstatutory exemption as to the anticompetitive practices disclosed in this case. In more recent consideration, the majority of the Court had this to say about the nonstatutory exemption:
 
 
 163
 The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. See Mine Workers v. Pennington, supra, 381 U.S. at 666, 85 S.Ct. 1585; Jewel Tea, supra, 381 U.S., at 692-693, 85 S.Ct. (1596) at 1603-1604, (14 L.Ed.2d 640) (opinion of WHITE, J.). Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, E. g., Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market. See Allen Bradley Co. v. Electrical Workers, 325 U.S. 797, 806-811, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Cox, Labor and the Antitrust Laws A Preliminary Analysis, 104 U.Pa.L.Rev. 252 (1955); Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U.Chi.L.Rev. 659 (1965).
 
 
 164
 Connell Construction Co. v. Plumbers & Steamfitters, 421 U.S. 616, 622-23, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975).
 
 
 165
 Justice Powell's language just quoted would hardly tend to allow the imposition of the restrictions on employment here sought by the hockey clubs in their own interests, as consistent with a "nonstatutory exemption" extrapolated from the Clayton and Norris-LaGuardia Acts. Even more recently the Supreme Court has dealt with the "Rule of Reason" upon which the appellants seek to rely. In National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), Justice Stevens, writing for the Court, stated the following as to the true meaning of that rule:
 
 
 166
 From Mr. Justice Brandeis' opinion for the Court in Chicago Board of Trade (V. U. S., 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683) to the Court opinion written by MR. JUSTICE POWELL in Continental T. V., Inc. (V. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568), the Court has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." 246 U.S. at 238, 38 S.Ct. at 243; quoted in 433 U.S. 36, at 49 n. 15, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568.
 
 
 167
 National Society of Professional Engineers v. United States, supra at 691, 98 S.Ct. at 1365. (Footnote omitted.)
 
 
 168
 I simply see no way that the restrictive practices we deal with in Clause 9A can be held to "promote competition" (unless, of course, we turn from economic competition to competition on ice). Clause 9A is clearly an unreasonable restraint of trade.
 
 STANDING
 
 169
 Finally, appellants have claimed, and do now, that McCourt had no standing to bring this suit. The District Judge in this case found that he had standing. Other courts have similarly found standing for players similarly situated because of threat to a player's earnings and the restriction upon his freedom to contract with a club in a different location or with different opportunities where opportunities appeared to him to be more desirable. See, e. g., Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); Haywood v. National Basketball Assoc., 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Douglas, J., in chambers opinion); Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), Cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).
 
 
 170
 The Supreme Court of the United States in Flood v. Kuhn, supra, did not specifically deal with standing. Since the United States Supreme Court granted certiorari and decided the Flood case on the interstate commerce issue, we must assume that it accepted the proposition that Flood had standing to prosecute his case.
 
 INJUNCTIVE RELIEF
 
 171
 No doubt Clause 9A operates directly on free agents to their obvious economic disadvantage by decreasing markedly their opportunities to get desirable economic terms with clubs other than their last employer. It also operates directly upon the player like McCourt who is chosen to "equalize" the loss occasioned by his former club's signing a "free agent" previously under contract to another club. Here McCourt seeks to enjoin orders from the club (Detroit) he contracted with, to report to and play for another club (Los Angeles) which he claims will provide him with much less satisfactory career opportunity than Detroit. He will also have to move self and family to Los Angeles, which he asserts is not his free choice and which he sees as an interference with his freedom. The District Judge found on his summary of the evidence that McCourt would suffer irreparable injury and granted injunctive relief as follows:
 
 
 172
 There is no real dispute in this record that the plaintiff will suffer irreparable injury if the injunction is not granted. All witnesses have agreed that if the plaintiff does not attend training camp with the team he is ultimately going to play with, he will achieve only mediocre success. Moreover, the evidence establishes that Los Angeles now has three exceptional players who play the same position as plaintiff. One of them, Mr. Dionne, is also a first draft choice and is far more established in hockey competition than this plaintiff. To deny plaintiff an injunction would require him to compete for a regular position with those three players. Mr. Abel's testimony supports plaintiff's contention that plaintiff would achieve greater success if he continued to play in Detroit. In our view, this plaintiff has, like all sports figures, an inalienable right to pursue stardom. To deny him that right is to injure him irreparably. Plaintiff need not prove his contentions to an absolute certainty. He has produced sufficient evidence to satisfy us that he will in fact suffer irreparable injury.
 
 
 173
 Moreover, on balance, we find that no defendant is threatened with an injury comparable to the plaintiff's irreparable harm. The Los Angeles Kings and the California Sports, Inc., have argued valiantly, but unpersuasively, that to deny them plaintiff's services will damage their franchise, that the team will be less proficient, that their record as a team and their reputation in the community will be seriously damaged and that they have already lost the sale of a large number of season tickets, which the testimony indicates equals upwards of $300,000. These alleged consequences, however, flow from defendants' loss of the services of Rogatien Vachon and not the injunction we will enter. Defendants may not recover for their inability or their refusal to renew Mr. Vachon's contract through the operation of a provision that violates the antitrust law. Any injury the Los Angeles Kings may suffer could have been avoided by exercising a greater effort to retain the services of Mr. Vachon. The testimony from his agent, Mr. Rauch, is that Los Angeles was afforded the first opportunity to contract for Vachon. In any event, there is no relationship shown in the record between the loss it claims it suffered and the services that it claimed plaintiff can recoup for it. Moreover, the balance of public interest favors this plaintiff. Professional sports generally and the public specifically are better served when there is open, unfettered competition for playing positions. See Bowman v. National Football League, 402 F.Supp. 754 (D.Minn.1975).
 
 
 174
 The District Judge's findings of fact are not clearly erroneous (Fed.R.Civ.P. 52(a)) and the relief he ordered did not constitute abuse of his discretion.
 
 
 175
 I would affirm the District Judge in granting injunctive relief against Clause 9A.
 
 ON MOTION FOR REHEARING
 
 176
 No judge in regular active service of the court having requested a vote on the suggestion for a rehearing en banc, the petition for rehearing filed herein by the plaintiff-appellee has been referred to the panel which heard the original appeal. Upon consideration of said petition, the court concludes that the petition does not raise any issues which were not already fully considered. While joining in the order for this reason, Judge Edwards adheres to the views expressed in his dissent. Accordingly,
 
 
 177
 The petition for rehearing is hereby denied.
 
 
 
 [1]
 Mr. Ziegler, the President of the National Hockey League, testified concerning the objectives the National Hockey League's version of the reserve system is designed to serve. According to Ziegler, the reserve system prevents deterioration in competitive balance among the NHL teams, thereby allowing the presentation of an attractive form of competitive entertainment. We note, however, the effectiveness of a reserve system in preserving competitive athletic balance depends in great measure upon its restraint of the free market forces that would otherwise control player movement within the sports league. Historically and continuing to the present day, professional sports leagues have employed various forms of the reserve system. See, e. g., Flood v. Kuhn, 407 U.S. 258, 259 n. 1, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (baseball); Smith v. Pro-football, Inc., 193 U.S.App.D.C. 19, 593 F.2d 1173 (1978) (football); and Robertson v. National Basketball Ass'n., 389 F.Supp. 867, 874 (S.D.N.Y.1975) (basketball)
 
 
 [2]
 Paragraph 17 describes a player's rights and duties upon the expiration of the term of his contract. In relevant part, Paragraph 17 states:
 (a) The Club may no later than August 10th of the final year of this contract, tender the Player a Player's Termination Contract and notify him that he has the choice of executing said Player's Termination Contract and delivering it to the Club on or before September 10th of that year or automatically being unconditionally released from any further obligation to provide services under this contract as of midnight, September 10th of that year. The Player's Termination Contract shall be on the same terms and conditions as this contract except that it shall be for only one additional season at the Player's previous year's salary and shall provide for the Player's unconditional release from any further obligation to provide services under said Player's Termination Contract effective the following June 1st.
 (b) If the Club does not take the action permitted under subsection(a), it shall no later than September 1st of the final year of this contract (August 10th if the Player is a "protected" player or played at least fifty NHL games in the preceding season), tender the Player a new Standard Player's Contract upon the same terms and conditions (including this Section 17) as this Standard Player's Contract except that salary and the number of years of its fixed term may be different.
 (c) Without regard to any action taken by the Club under subsections (a) or (b), the Player may notify the Club no later than September 10th of the final year of this contract that he wishes to sign a Player's Option Contract. If the Player gives such notice, the Club shall no later than September 25th of that year tender the Player a Player's Option Contract, and the Player shall forthwith enter into said contract. The Player's Option Contract shall be on the same terms and conditions as this contract except that it shall be for only one additional season at the Player's previous year's salary and shall provide that effective the following June 1st the Player will be a free agent, without any further obligation to provide services under said Player's Option Contract, and as such will have the right, as provided by Section 9A of the League By-Laws, the text of which Section is printed on the reverse side hereof, to negotiate and contract with any club in the League, or with any other club.
 (d) If the Club does not take the action permitted under subsection (a) and the Player does not give notice to the Club in accordance with subsection (c), then the parties shall enter into a new Standard Player's Contract by mutual agreement or, failing such agreement, the parties shall enter into a new one-year Standard Player's Contract for the succeeding season upon the same terms and conditions (including this Section 17) as this Standard Player's Contract, except as to salary, which shall be determined by neutral arbitration under the applicable collective bargaining agreement providing a mechanism for such arbitration, provided, however, that if no such collective bargaining agreement is then in effect, the Player's salary shall be the same as his salary for the previous year.
 Paragraph 18 goes further. By Paragraph 18, the parties "mutually promise and agree to be legally bound by the Constitution and By-Laws of the League and by all the terms and provisions thereof . . . ."
 
 
 [3]
 Section 9.03, in part, provides:
 (a) Each hockey player employed by each Club in the National Hockey League shall enter into the form of Standard Players Contract, . . . hereby recognized as valid and binding.
 (b) The Association, recognizing that the Clubs have entered into this Agreement in reliance on Section 9.03(a), represents that it has been duly authorized to collectively agree to paragraph 17 of the Standard Players Contract . . . and to the applicability of the provisions of Section 9A of the National Hockey League By-Laws as fair and reasonable terms of employment . . . .
 The Association hereby so agrees in its capacity as the exclusive bargaining representative of hockey players in the National Hockey League under this Agreement.
 
 
 [4]
 McCourt has claimed that the Red Wings admitted that his contract included an unwritten understanding with the club that he would not be involuntarily traded. Nevertheless, his contract provided, in Paragraph 11:
 It is mutually agreed that the Club shall have the right to sell, assign, exchange and transfer this contract, and to loan the Player's services to any other professional hockey club, and the Player agrees to accept and be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by the Player and such other Club . . . .
 If the Player fails to report to such other Club he may be suspended by such other club and no salary shall be payable to him during the period of such suspension . . . .
 The testimony was that such side agreements were not infrequent, but that any contract which formally incorporates a no-trade provision would automatically be rejected by the Commissioner. This is obviously true, since By-Law Section 9A.8(d), incorporated in McCourt's contract by Paragraphs 17 and 18, specifically provided that the contracts of all players under an acquiring club at the time a free agent is acquired shall be available for equalization purposes. The breach of contract counts have not as yet been decided below or appealed to this court.
 
 
 [5]
 Three other counts in the complaint asserting state contract and antitrust claims and one count alleging a violation of the U.S. Arbitration Act, 9 U.S.C. § 1 Et seq. (1976), are not the subject of this appeal
 
 
 [6]
 The defendants brought this appeal from the issuance of the preliminary injunction. Following oral argument, the parties filed a stipulation stating:
 It is hereby stipulated by and between all the parties to this action: (1) that all parties waive their rights to a trial on the merits of this action as to Count I of plaintiff's Complaint; (2) that the record and the oral and written findings of fact and conclusions of law now before this Court, which were developed at the hearing on plaintiff's motion for preliminary injunction, shall be deemed to constitute the final record and findings of fact and conclusions of law after a trial on the merits as to such Count I; (3) that the appeals filed by defendants under 28 U.S.C. § 1292(a)(1) from the order granting a preliminary injunction may be treated by this Court as appeals, under 28 U.S.C. § 1291, from a final decision of the District Court and (4) that plaintiff may renew his remaining claims following this appeal.
 
 
 [7]
 Jacobs and Winter, in Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L.J. 1 (1971), strongly suggest that the antitrust issue is altogether irrelevant in considering the validity of the reserve system. This article and its conclusion were specifically noted, without comment, by Mr. Justice Blackmun in Flood v. Kuhn, supra. In Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court reversed the dismissal of a complaint charging Sherman Act violations by the National Football League and in so doing held that a complaint by a former guard on the Detroit Lions team charging that the National Football League had boycotted him and prevented him from becoming a player-coach in the Pacific Coast League, adequately stated a cause of action under the antitrust laws. A majority of the Court made it clear that while Radovich was entitled to an opportunity to prove his charges, it expressed no opinion as to whether or not the respondents had in fact violated the antitrust laws. The precise language of the reserve system provisions does not appear to have been considered by the Supreme Court in Radovich, its emphasis rather having been to hold that its prior decisions relating to the game of baseball did not invariably apply to all team sports. Lower court activity has almost uniformly indicated that the restraints of the reserve system in sports other than baseball amount to a type of group boycott against a player who desires to sell his professional athletic services to another team after having earlier been engaged by a competing team. See, e. g., Smith, supra, 593 F.2d at 1177-1181; Mackey, supra, 543 F.2d at 618-22; Robertson, supra, 389 F.Supp. at 893; Kapp v. National Football League, 390 F.Supp. 73, 80-83 (N.D.Cal.1974), Aff'd in part and appeal dismissed in part as moot, 586 F.2d 644 (9th Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1056-57 (C.D.Cal.1971), Injunction reinstated sub nom. Haywood v. National Basketball Ass'n., 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (Douglas, J., in chambers, 1971). See generally 7 J. O. Von Kalinowski, Antitrust Law and Trade Regulation, § 50.01 Et seq. (1978)
 
 
 [8]
 Indeed, the most logical third party to complain about the reserve system, the World Hockey Association, expressly accepted this system in a settlement to the litigation which produced Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972)
 
 
 [9]
 Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), describes good faith collective bargaining and makes it clear that the Act does not compel either party to alter its initial stance on an issue. Section 8(d), in relevant part, states:
 (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but Such obligation does not compel either party to agree to a proposal or require the making of a concession . . . (emphasis added).
 
 
 [10]
 Other circuits have reached the same conclusions. NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729 (1st Cir. 1964); NLRB v. Landis Tool Co., 193 F.2d 279 (3rd Cir. 1952); NLRB v. Norfolk Shipbuilding & Drydock Corp., 195 F.2d 632 (4th Cir. 1952); Chevron Oil Co. v. NLRB, 442 F.2d 1067 (5th Cir. 1971); Wal-Lite Div. of United States Gypsum Co. v. NLRB, 484 F.2d 108 (8th Cir. 1973); NLRB v. MacMillan Ring-Free Oil Co., 394 F.2d 26 (9th Cir.), Cert. denied, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968); NLRB v. Tomco Communications, Inc., 567 F.2d 871 (9th Cir. 1978)
 
 
 [11]
 Since the NHLPA represented 100% Of the players, such action would have a profound effect, and thereby, the threat must have carried substantial weight
 
 
 [12]
 Mr. Eagleson, the Executive Director of the NHLPA, testified that the union agreed to the provisions of By-Law Section 9A in return for many player benefits. In addition to the benefits described in the district judge's opinion, our review of the record indicates that the players bargained for substantial benefits: (1) increased pension benefits; (2) increased bonus money to players on teams finishing high in their divisions and participating in the Stanley Cup Playoffs; (3) sharing with the owners receipts from international hockey games; (4) greater salary continuation for players injured as a result of playing hockey; (5) increased training camp expense allowances; (6) modification of NHL waiver procedures; and (7) modification in scheduling of games and travel during the season
 
 
 [13]
 The collective bargaining agreement, Sections 9.03(c) and (e), provides that:
 (c) It is expressly understood that if the National Hockey League enters into an agreement to merge with the World Hockey Association, the National Hockey League Players Association shall forthwith be entitled to terminate either this entire agreement, or its agreement contained in this Section 9.03 with respect to the said paragraph 17, . . . and the said Section 9A upon written notice to the Clubs within 15 days after notice of said agreement to merge. If the Association elects to terminate as provided in the preceding sentence, the subjects covered by the said termination shall then be reopened for collective bargaining at the request of either party.
 (e) The parties hereto recognize that recent court decisions affecting professional sports other than hockey, may give rise to uncertainty as to whether the provisions of Paragraph 17 of the Standard Players Contract . . . and Section 9A of the National Hockey League By-Laws are lawful subjects of collective bargaining. The Association further recognizes that the provisions of this agreement beneficial to the Association and the (sic) the players were entered into by both parties in the good faith belief that subparagraphs (a) and (b) above are lawful subjects of collective bargaining and are valid, and that the Clubs agreed to said beneficial provisions in reliance thereon. In the event of a final judicial determination not subject to appeal that Paragraph 17 of the Standard Players Contract . . . or Section 9A of the National Hockey League By-Laws are not lawful subjects of collective bargaining or are otherwise invalid, the Clubs may within 30 days thereafter terminate this Collective Bargaining Agreement upon written notice to the Association. If the Clubs elect to terminate as provided in the preceding sentence the parties shall promptly thereafter commence collective bargaining negotiations in an effort to arrive at a new collective bargaining agreement.
 
 
 [1]
 Obligation to make equalization payment
 9A. 6. Each time that a player becomes a free agent and the right to his services is subsequently acquired by any Member Club other than the club with which he was last under contract or by any club owned or controlled by any such Member Club, the Member Club first acquiring the right to his services, or owning or controlling the club first acquiring that right, shall make an equalization payment to the Member Club with which such player was previously under contract, as prescribed by subsection 8 of this By-Law. Each Member Club may acquire the right to the services of as many free agents as it wishes, subject to the provisions of subsection 9 of this By-Law.