**Dale McCOURT, an Individual, Plaintiff,**

**v.**

**CALIFORNIA SPORTS, INCORPORATED, a California Corporation, The Los Angeles Kings Inc., a California Corporation, Detroit Hockey Club, Inc., a Michigan Corporation, National Hockey League, an unincorporated voluntary association, and National Hockey League Players' Association, an unincorporated voluntary association, Defendants.**

**Civ. No. 872221.**

United States District Court,
E. D. Michigan, S. D.

Sept. 28, 1978.

905

Laurence D. Connor, John A. Entenman, Ted T. Amsden, Detroit, Mich., for plaintiffs.

Avern Cohen, William G. Christopher, Detroit, Mich., for California Sports and LA Kings.

John A. Wise, Jr., Robert A. Marsac, Detroit, Mich., for Detroit Hockey Club.

Joseph A. Sullivan, Detroit, Mich., for National Hockey League Players' Assn.

Kenneth J. McIntyre, Detroit, Mich., for National Hockey League.

Fred W. Freeman, Detroit, Mich., Gilbert Stein, Gen. Counsel, NHL, New York City, for National Hockey League.

## MEMORANDUM OPINION *

DeMASCIO, District Judge.

The plaintiff, a professional hockey player, filed this suit naming as defendants the National Hockey League (NHL), the National Hockey League Players' Association (NHLPA), California Sports, Inc., The Los Angeles Kings, and the Detroit Hockey Club (Detroit Red Wings). The Los Angeles Kings and the Detroit Red Wings are member hockey teams in the NHL, which is a non-profit corporation governed by a Board of Governors and a president elected by that Board. Each of the 17-member clubs of the NHL has a representative vote on the Board of Governors.

* To accommodate the parties' right to appeal the granting of plaintiff's motion for preliminary injunction, we made oral findings of fact and conclusions of law. It now appears that the parties intend to proceed upon a complete transcript and we, therefore, take this occasion to edit and supplement our oral findings.

The NHL Board of Governors promulgated and adopted a Uniform Standard Player's Contract, which every hockey player for a member club must sign as a condition of employment. Prior to November 27, 1973, the NHL Standard Player's Contract contained a reserve clause which provided that upon the expiration of a player's contract, the player agreed to continue his employment with the same club on the same terms and conditions except for salary. Salary was subject to mutual agreement or to arbitration in the case of a failure to agree.

In 1972, the World Hockey Association filed suit against the NHL attacking the reserve clause which prohibited NHL hockey players, whose contracts had expired, from signing with World Hockey Association Teams. In *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462, 518 (E.D.Pa.1972), the court preliminarily enjoined the NHL and its member clubs from enforcing the reserve clause because there was a substantial likelihood that it violated Section 2 of the Sherman Act, 15 U.S.C. § 2 (1970). The court specifically found that the reserve clause had never been the subject of bona fide, good faith collective bargaining. 351 F.Supp. at 498. As a result of the preliminary injunction, and a breakdown in negotiations with the NHLPA, the NHL Board of Governors unilaterally incorporated into the 1974 Uniform Standard Player's Contract a new reserve clause, paragraph 17, and a new bylaw, Section 9A. *See* plaintiff's Exhibit # 2 at 3.

Paragraph 17 of the 1974 Standard Player's Contract provides, among other things, that upon the expiration of a player's contract, the player could be required to contract for an additional option year. After the option year, the player becomes a "free agent" and can sign with any hockey club. Bylaw 9A provides that a player who becomes a free agent may negotiate and contract with any member club; but a team that contracts with a free agent must make an equalization payment consisting of an assignment of player contracts, draft choices and/or cash to the free agent's former club.[1] Any player's contract with the acquiring team is available for compensation. Section 9A.8(a) provides that if the two teams cannot agree upon the equalization payment within three business days after the free agent signs with the acquiring team, both teams must, within two business days thereafter, submit their "last best offer" to an arbitrator who is under contract to the NHL and serves without pay. In making his selection, the arbitrator must, without variance, select one of the offers submitted by the involved clubs. § 9A.8(b).

In this action, plaintiff seeks to enjoin the enforcement of an arbitrator's award assigning his contract with the Red Wings to the Los Angeles Kings as equalization payment for free agent Rogatien Vachon. Plaintiff alleges that bylaw 9A and Section 17 of the Standard Player's Contract are an unreasonable restraint upon trade and commerce. Specifically, we must determine whether plaintiff has demonstrated probable success on the merits of his claim that bylaw 9A violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which declares illegal, "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." The Supreme Court has often held that agreements that unreasonably restrain trade are proscribed by the Act. *See e. g., Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The court in *Mackey v. The National Football League*, 543 F.2d 606, 620 (8th Cir. 1976) stated:

> The focus of an inquiry under the Rule of Reason is whether the restraint imposed is justified by legitimate business purposes, and is no more restrictive than necessary.

Unreasonable restraints on competition in the market for players' services are prohibited by the Sherman Act. 543 F.2d at 617.

■ The defendants contend that the plaintiff lacks standing under antitrust provisions to challenge the alleged anticompeti-

---

1. It was stipulated that cash payment could be considered only as a last resort.

tive effects of bylaw 9A. Defendants argue that the alleged market restraints imposed by the equalization provision affects only a free agent's ability to contract with other clubs in a free and open market, and, therefore, Mr. Vachon is the only party to this arbitration award with standing to challenge 9A. Plaintiff's alleged injury, however, arises from the direct application of bylaw 9A. When a player becomes a free agent, every players' contract on the acquiring team is in jeopardy. In this case, the application of bylaw 9A directly injures the plaintiff because he can no longer perform the contract he freely made with the Detroit Red Wings. Plaintiff is, therefore, threatened with loss or damage to an interest cognizable in equity and thus has standing to bring this suit. *See Cullen Bryant v. National Football League,* (No. 75–2540) (C.D.Cal. July 30, 1975); *cf. Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

Plaintiff's evidence demonstrated a likelihood that he will successfully establish at trial that bylaw 9A unreasonably restrains professional hockey players from freely marketing their services and that it deters member clubs from signing free agents because of the uncertainty created by the required equalization payment. We agree with plaintiff that bylaw 9A has built-in market uncertainties that seriously reduce competition. Like the "Rozelle Rule," bylaw 9A applies to all players without regard to status or ability; it applies to the average player and to the superstar alike; it is unlimited in duration and acts as a perpetual restriction upon a player's ability to freely contract for his services. Bylaw 9A cannot be justified by any legitimate business purpose and is more restrictive than necessary to achieve the NHL's announced goal of maintaining competitive balance[2]. It inhibits and deters teams from signing free agents, decreases a player's bargaining power in negotiations, denies players the right to sell their services

in a free and open market, and it depresses salaries more than if competitive bidding were allowed. Thus, we conclude that plaintiff has sufficiently established that bylaw 9A, as applied, unreasonably restrains trade and commerce and is violative of Section 1 of the Sherman Act. *See Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976).

These findings are fully supported by the record. Mr. Art Kaminsky, an attorney and player agent, testified that he represented Mr. Gary Sergeant, who became a free agent after playing out his option with the Los Angeles Kings. Mr. Kaminsky said that he sent Mailgrams to the six teams suggested by his client but that he did not send inquiries to either Montreal or Toronto because he believed neither would be willing to pay an adequate equalization payment. He stated that Mr. Allen, General Manager of Philadelphia, decided not to pursue his interest in Mr. Sergeant because of the compensation requirement and that Mr. Harry Sinden, General Manager of the Boston Bruins, also indicated that signing Sergeant would be difficult because of the amount of compensation required for players like Mr. Sergeant. Mr. Kaminsky further testified that Mr. Sinden indicated that Los Angeles would probably want Mr. Mike Milberry as compensation and that the Bruins would be unwilling to part with Milberry's services. Mr. Kaminsky further testified that Mr. Bob Pulford, General Manager and Coach of Chicago, was interested in acquiring Sergeant, but could not reach an agreement with the Los Angeles Kings on compensation. Mr. Kaminsky concluded that without bylaw 9A he could have negotiated a higher salary for Sergeant because "certain clubs will pay for talent." Mr. Kaminsky further testified that, although he would rate Mr. Vachon as one of the two outstanding goalies in North America, certain clubs would be reluctant to acquire Vachon because they knew that the equalization payment required could be excessive. Finally, Mr. Kaminsky conclud-

---

**2.** Mr. John Ziegler, President of the NHL, testified that less restrictive methods were suggested by the NHLPA, but the record is devoid of any evidence that these suggestions were treated seriously.

ed that bylaw 9A was not essential to maintain competitive balance in the league. He indicated that there is little or no competitive balance within the league at the present time.

Mr. Lawrence Rauch, another player agent, testified that he represented Rogatien Vachon. He testified that he sent every club a list of the free agents he represented, including Vachon, and that the Washington Capitals, New York Rangers, Detroit Red Wings, Chicago Blackhawks and Vancouver Canucks contacted him concerning Vachon. Some teams indicated that they could not meet the price quoted in the Montreal papers following rumors that Vachon was going to New York but he expressly testified that Vancouver and New York were concerned about the required equalization payment. Mr. Rauch concluded that Mr. Vachon could have received a larger contract if no equalization payment was required[3]. He based this conclusion on the purchase of two Swedish players by the New York Rangers for $1.2 million for a two-year period. The two Swedish players were acquired from Winnipeg of the World Hockey Association, and therefore, no compensation was required[4].

The plaintiff next called as a witness Mr. Sidney Abel, an acknowledged expert in the hockey profession[5]. Mr. Abel testified that as a result of this arbitration award, general managers will be reluctant to sign free agents. He testified that a team could not gamble on losing a first-round draft choice, like plaintiff, as equalization payment for the acquisition of a player ten years older. He further testified that bylaw 9A was not an important factor in trying to achieve competitive balance in the NHL. He concluded that competitive parity can be attained just as easily by wisely selected draft choices.

Plaintiff next called Dr. Koch, an eminent economist whom we credit fully. Dr. Koch testified that a cartel theory was applicable to the input side of the market for hockey players in the NHL. He testified that the NHL had monopsony power as indicated by the draft, the Standard Player's Contract and the reserve clause. He testified that the existence of the World Hockey Association was not a significant factor affecting the monopsony power of the NHL. In his judgment, this is because the NHL is qualitatively superior and because hockey players would rather play in the NHL. In Dr. Koch's opinion, public perception of the NHL is greater and players' salaries are higher. He concluded that, in economic terms, the NHL is a distinct market for player services because there is insufficient substitutability between the NHL and the World Hockey Association. The evidence developed prior to and after Dr. Koch's testimony supports his conclusion that the World Hockey Association has not made a significant impact upon the NHL.

Dr. Koch testified that economic analysis applied to bylaw 9A and that it had the effect of eliminating the market for free agent services. He concluded that the equalization provision unreasonably restrains trade and commerce for three reasons. First, the acquiring team must pay both a salary and compensation for the free agent. This higher price adversely impacts the market for the free agent's services. Second, because the acquiring team does not know what compensation will be required, an uncertainty, which has the effect of reducing if not completely eliminating

---

**3.** Mr. Rauch testified that during the winter of Mr. Vachon's option year, he questioned whether the equalization provision applied to Vachon because Vachon signed a 1972 Standard Form Contract which pre-dated bylaw 9A but that he was later informed that the NHL had ruled that compensation would in fact be required.

**4.** The unrefuted affidavit of Mr. Jed Cohen is already a part of the record, and we do not

repeat its content. It clearly sets forth another example of the unreasonable restraint upon the market for player services.

**5.** Mr. Abel is a former Detroit Red Wing player, a former General Manager of St. Louis, a former General Manager of Kansas City, and is currently employed as a hockey analyst for WJR Radio and the Detroit Red Wings.

competition, is introduced into the market. Finally, the bylaw has the effect of depressing salaries in the NHL. On cross-examination, Dr. Koch stated that the new reserve clause was one factor explaining higher salaries in the NHL because a club knows if a player plays out his option he can seek a higher salary with another member club or in the World Hockey Association. However, Dr. Koch testified that without the compensation requirement salaries would be even higher.

Upon questioning by the court, Mr. McGuire, General Manager of the Los Angeles Kings, corroborated Dr. Koch's testimony concerning the uncertainty that is introduced into the market by the equalization provision. Mr. McGuire testified that in early July 1978, Mr. Lindsay, the General Manager of Detroit, and Mr. Jack Kent Cooke, owner of the Los Angeles Kings, began discussions about a satisfactory payment for Mr. Vachon. Mr. McGuire testified that prior to Detroit signing Vachon on August 8, 1978, Mr. Cooke did not suggest what he would accept as an equalization payment. The offers made by Mr. Lindsay were considered unacceptable. To Mr. McGuire's knowledge, Mr. Cooke never told Mr. Lindsay that Los Angeles would demand the plaintiff as compensation for signing Vachon. That proposal was first submitted to the arbitrator. This is an example of the uncertainty that can be created by the application of bylaw 9A. By declining to disclose its demands, defendant Los Angeles Kings was able to extend that uncertainty to the contract of every player on the acquiring team.

The defendants contend that bylaw 9A is not an unreasonable restraint upon trade or commerce because it is designed to achieve essential league objectives. To support this contention, the defendant League called as a witness Mr. John Ziegler, the President of the National Hockey League. He testified that bylaw 9A is necessary to maintain economic solvency of all the teams in the league and to maintain employment opportunities for players [6]. Mr. Ziegler's testimony was also offered to support other arguments advanced by the NHL which are fully set forth in its brief at pp. 35–40. Basically, the NHL argues that bylaw 9A is essential to maintain the competitive balance among member teams in the NHL, that the less affluent clubs and those clubs located in less desirable cities would not be able to retain good hockey players without bylaw 9A, that the bylaw is less restrictive than the Rozelle rule because the arbitrator making the award is a neutral third party, and that existence of the World Hockey Association provides "the extra dimension of assuring the reasonableness of bylaw 9A." We disagree that the evidence supports any of these arguments.

In our view, there is no significant difference between bylaw 9A and the Rozelle rule. Although the application of bylaw 9A to a superstar and to an average player may cause different market reactions, the anticompetitive effect upon the market is the same. Member clubs in the NHL are reluctant to negotiate for the services of a free agent superstar because they can be required to assign the services of a player they do not wish to part with. If the free agent's former team declines to negotiate, it may well obtain the acquiring team's best player [7]. This is true even though the involved teams have different opinions of the value of the free agent's services to the acquiring team. Moreover, if it is true that member clubs know in advance that excessive compensation will be required for a superstar, the market for his services is severely restricted. The effect upon the market for the services of an average player is even more pronounced. Since member

---

**6.** The NHL argues that competitive balance is essential to generate sufficient gate receipts which in turn will assure the economic solvency of every team in the league.

**7.** Mr. McGuire testified that he would have no trouble assessing what player or players he would be required to assign as compensation if

he acquired a free agent. This is so because if he acquired a team's best player, he would be expected to assign the contract of his best player. Therefore, in the case of a superstar, it is clear that the arbitrator's services are not essential.

clubs may desire his services but yet be unwilling to compensate his former club, the market for the services of an average player could well be eliminated. Because there is a real possibility that this result can occur for average hockey players, bylaw 9A is just as anticompetitive as the Rozelle rule.

Nor does the evidence support the contention that bylaw 9A is essential to preserve economic solvency. If bylaw 9A is essential to protect gate receipts, its application to all players regardless of status or ability cannot be justified. Certainly, there are players on these teams who do not enhance gate receipts. The goals sought by the League, if real rather than imagined, can be advanced by less restrictive means. Even Mr. Ziegler conceded that there were alternatives to using players as equalization, such as draft choices and cash. The NHL appears overly concerned that draft choices alone will not preserve competitive balance among its member clubs [8]. Other sports, however, have demonstrated that a capable, talented rookie draft choice can be as exciting as an established player and sometimes is as much an attraction for sports fans. In any event, bylaw 9A is not addressed solely to established stars, it affects all players.

Finally, the defendants argue that plaintiff may not obtain preliminary injunctive relief upon his antitrust claim because they should be afforded the non-statutory labor exemption from antitrust sanctions. The preponderance of evidence, however, establishes that bylaw 9A was not the product of bona fide arm's length bargaining over any of its anticompetitive provisions. The evidence establishes that the bylaw was unilaterally imposed upon the NHLPA and was incorporated into the collective bargaining agreement in the identical language it contained when it was first adopted by the League.

Mr. John Ziegler, President of the National Hockey League, testified that in March 1973, after discussions between the NHL and the NHLPA, the Board of Governors authorized a special committee to negotiate a new reserve clause. NHL Exh. 1 at 2–4. At a meeting on March 19, 1973, the owners and player representatives tentatively agreed upon a new reserve clause pending ratification by the players. NHL Exh. 2 at 3. The tentative agreement provided, among other things, that a player with five or more years in the NHL could elect to become a free agent. See NHL Exh. 3 for the full text of the proposed reserve clause. In June 1973, the NHLPA rejected the proposed reserve clause. Thereafter, the NHLPA, on advice of counsel, refused to attend a meeting on August 28, 1973 to further discuss the proposed reserve clause. Plaintiff Exh. 2 at 3. The NHLPA elected instead to await the final outcome of the World Hockey Association's suit attacking the old reserve clause. See *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., supra.* When the positions of the parties solidified, the NHL unilaterally adopted bylaw 9A on November 27, 1973. Plaintiff Exh. 2 at 3.

Several months later, in February 1974, the district court approved a consent decree in the World Hockey Association suit. The NHLPA then threatened to file its own antitrust action to challenge the validity of bylaw 9A. To forestall that suit, the NHL agreed on July 9, 1975, that it would not assert laches or equitable estoppel as a defense. See Plaintiff Exh. 3 at 1; Exh. 4 at 1. At a subsequent meeting, on August 13, 1975, Mr. Ackerman, counsel for the NHL, implied that there would be no collective bargaining agreement until the dispute over bylaw 9A was resolved. The NHLPA, however, persisted in its refusal to negotiate on the clause. Plaintiff Exh. 5 at 1–2. The NHLPA's threat of an antitrust suit did not alter the NHL's firm position on bylaw 9A. On August 15, 1975, the members of the owner-players' council were advised that:

Mr. Eagleson stated that the commencement of this type of action was still being considered. I replied that decision

---

8. The plaintiff was a draft choice one short year ago. Yet, the defendant Los Angeles Kings argues that denying it plaintiff's services will severely damage its franchise.

was, of course, up to them, but that the owners would not negotiate from fear of that possibility. Pl. Exh. 5 at 2.

On May 4, 1976, the NHL and the NHLPA signed their first collective bargaining agreement retroactive from September 15, 1975. Collective Bargaining Agreement (CBA) § 2.01. The collective bargaining agreement provides that paragraph 17 of the Standard Player's Contract and bylaw 9A are "fair and reasonable terms of employment." CBA § 9.03(b). Like the Eighth Circuit Court of Appeals in *Mackey*, however, we find that the mere inclusion of bylaw 9A in the collective bargaining agreement cannot serve to immunize it from antitrust sanctions. The evidence offered at the hearing persuades us that the parties did not collectively bargain for bylaw 9A. Mr. Eagleson testified that:

> [T]he owners made it clear that their bottom line position was non-debatable on the By-Law that they had passed and the contract that they had approved unilaterally. Eagleson dep. at 27.

He further testified that as late as August 1975, the player representatives agreed that unless further "concessions" were made by the owners, they would recommend that their teammates not attend training camp. *Id.* The NHLPA agreed to include bylaw 9A in the collective bargaining agreement only after the NHL conceded that the NHLPA could terminate the entire agreement if the NHL merged with the World Hockey Association. The agreement also provided that the owners could terminate the agreement if there was a judicial determination that bylaw 9A was invalid. Eagleson dep. at 27–28; CBA §§ 9.03(c) and (e). Even after the collective bargaining agreement was signed, the NHLPA suggested modifications of the equalization provision. *See* Eagleson dep. at 39–41. Mr. Eagleson testified that the suggested modifications would be of "great benefit" to the players, suggesting to us that the NHLPA never bargained for bylaw 9A in the first instance. *Id.* at 69.

Mr. Ziegler further stated on cross-examination that although the NHL was willing to negotiate on equalization at any time, the players had to adhere to the bylaw because the Standard Player's Contract required them to adhere to all bylaws adopted by the NHL. Standard Player's Contract ¶ 18. In effect, although the owners indicated that they were willing to negotiate, the players really had no choice. Mr. Ziegler stated that the owners took a strong stand toward equalization, that they believed that bylaw 9A was fair, and that they wanted it incorporated into the collective bargaining agreement. Moreover, it is apparent that both parties to the collective bargaining agreement realized fully that bylaw 9A could not withstand judicial scrutiny.

To support its contention that bylaw 9A was collectively bargained, the NHL argues that the NHLPA received a substantial quid pro quo for agreeing to include the bylaw in the agreement. In our view, the evidence more logically supports the inference that the benefits were received as a settlement of NHLPA's threatened suit to challenge the bylaw. The NHLPA's acceptance of bylaw 9A was essential to get the parties off dead center. The players had no other alternative. The Standard Player's Contract required them to accept all the bylaws adopted by the NHL. We cannot find from this evidence that the increased pension benefits, the right for players to negotiate salaries and the right to share in the proceeds from international hockey competition are directly related to collective bargaining on bylaw 9A. The evidence suggests, for example, that the players "would not agree to [international hockey competition] . . . unless agreement was reached on their request for increased pension benefits." *See* Plaintiff Exh. # 5 at 3. The bylaw was included in the collective bargaining agreement to give the impression that it was a bargained-for provision. When labor and non-labor groups combine to insert into a collective bargaining agreement a non-negotiated provision, courts will not afford either party the non-statutory labor exemption.

Thus, we conclude that plaintiff has demonstrated a great likelihood that he will ultimately succeed upon the merits of his claim that bylaw 9A, as applied, illegally restrains trade and commerce. If plaintiff has established the remaining prerequisites for injunctive relief, and we think he has, he is entitled to the injunction he seeks. There is no real dispute in this record that the plaintiff will suffer irreparable injury if the injunction is not granted. All witnesses have agreed that if the plaintiff does not attend training camp with the team he is ultimately going to play with, he will achieve only mediocre success. *See* affidavit of Mr. Jack Kent Cooke at 3. Moreover, the evidence establishes that Los Angeles now has three exceptional players who play the same position as plaintiff. One of them, Mr. Dionne, is also a first draft choice and is far more established in hockey competition than this plaintiff. To deny plaintiff an injunction would require him to compete for a regular position with those three players. Mr. Abel's testimony supports plaintiff's contention that plaintiff would achieve greater success if he continued to play in Detroit. In our view, this plaintiff has, like all sports figures, an inalienable right to pursue stardom. To deny him that right is to injure him irreparably. Plaintiff need not prove his contentions to an absolute certainty. He has produced sufficient evidence to satisfy us that he will in fact suffer irreparable injury.

Moreover, on balance, we find that no defendant is threatened with an injury comparable to the plaintiff's irreparable harm. The Los Angeles Kings and the California Sports, Inc., have argued valiantly, but unpersuasively, that to deny them plaintiff's services will damage their franchise, that the team will be less proficient, that their record as a team and their reputation in the community will be seriously damaged and that they have already lost the sale of a large number of season tickets, which the testimony indicates equals upwards of $300,000. These alleged consequences, however, flow from defendants' loss of the services of Rogatien Vachon and not the injunction we will enter. Defendants may not recover for their inability or their refusal to renew Mr. Vachon's contract through the operation of a provision that violates the antitrust law. Any injury the Los Angeles Kings may suffer could have been avoided by exercising a greater effort to retain the services of Mr. Vachon. The testimony from his agent, Mr. Rauch, is that Los Angeles was afforded the first opportunity to contract for Vachon. In any event, there is no relationship shown in the record between the loss it claims it suffered and the services that it claimed plaintiff can recoup for it. Moreover, the balance of public interest favors this plaintiff. Professional sports generally and the public specifically are better served when there is open, unfettered competition for playing positions. *See Bowman v. National Football League*, 402 F.Supp. 754 (D.Minn.1975).

Accordingly, plaintiff's motion for preliminary injunction is hereby granted.

IT IS SO ORDERED.