Keith JACKSON, D.J. Dozier, Thomas Everett, Louis Lipps, Stephone Paige, Joseph Phillips, Webster Slaughter, Natu Tuatagaloa, Garin Veris and Leon White, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty-Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro-Football, Inc.; Defendants.

Civ. No. 4-92-876.

United States District Court, D. Minnesota, Fourth Division.

Sept. 24, 1992.

Edward M. Glennon, Carol T. Rieger, Charles J. Lloyd, and Lindquist & Vennum, Minneapolis, Minn., James W. Quinn, Jeffrey L. Kessler, and Weil, Gotshal & Manges, New York City, for plaintiffs.

James Fitzmaurice, Daniel J. Connolly, and Faegre & Benson, Minneapolis, Minn., Herbert Dym, Jeffrey Pash, and Covington & Burling, Washington, D.C., Frank Rothman, Shepard Goldfein, and Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendants.

Peter S. Hendrixson, and Dorsey & Whitney, Minneapolis, Minn., for defendant Philadelphia Eagles Football Club, Inc.

## TEMPORARY RESTRAINING ORDER

DOTY, District Judge.

This matter is before the court on plaintiffs' motion for a temporary restraining order and preliminary injunction to prohibit defendants from continuing to restrict plaintiffs pursuant to the Right of First Refusal/Compensation Rules of Plan B. Based on a review of the file, record and proceedings herein, the court grants plaintiffs' motion for a temporary restraining order and defers ruling on their motion for a preliminary injunction.

## BACKGROUND

Plaintiffs are professional athletes who have been employed by various member teams of the National Football League ("NFL"). Plaintiffs bring the present action seeking relief for injuries that they allegedly have suffered as a result of defendants' Right of First Refusal/Compensation Rules of Plan B ("the Plan B rules"). Plaintiffs' contracts with their respective teams all expired as of February 1, 1992. By operation of the Plan B rules, as of April 1, 1992, all of the plaintiffs' former teams gained the exclusive rights to plaintiffs' services.[1] At the time the present suit was filed, September 14, 1992, all ten players remained restricted under those rules.

As of the date of this order, September 24, 1992, only four players remain restricted by the Plan B rules: Keith Jackson, Webster Slaughter, D.J. Dozier and Garin Veris. Of the remaining six players, Thomas Everett was traded and has subsequently signed a contract for the 1992 season. Natu Tuatagaloa, Louis Lipps and Leon White were released by their former clubs and have subsequently signed contracts with new clubs for the 1992 season. Stephone Paige and Joseph Phillips were also released by their former clubs, and at the present time remain unrestricted free agents.

The four players who remain restricted under the Plan B rules contend that they are entitled to injunctive relief because they have suffered and continue to suffer immediate, irreparable harm for which monetary damages are inadequate. Relying on the jury's findings in the *McNeil* case [2] as the basis for the application of the

1. As this court noted in the *Powell* litigation:

   Under the Right of First Refusal/Compensation system, every NFL club retains rights to "its players" even though, in the case of veteran free agents, contractual rights to a player no longer exist. When a veteran player's contract has expired and a competing NFL club makes an offer to that player, the player's old team may keep the player simply by matching the competing offer; the player's old club therefore is said to have a "right of first refusal" as to the player's services. If the competing offer is large enough, and the club to which the player was previously under contract does not choose to match a competing offer, the old club will receive draft choice "compensation" which may be extremely costly to the acquiring club. [The *Powell*] plaintiffs allege that in addition to restraining player movement, this system effectively eliminated competition among NFL clubs for player services.
   *Powell v. National Football League*, 678 F.Supp. 777, 779 (D.Minn.1988), *rev'd on other grounds*, 930 F.2d 1293 (8th Cir.1989), *cert. denied*, — U.S. —, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991).
   Plaintiffs in *McNeil v. National Football League* also alleged, and the jury so found, that the Plan B Rules substantially restrain competition in the relevant market for professional football players's services. *See infra* n. 2.

2. The *McNeil* case involved eight professional football players whose contracts expired on February 1, 1990, and alleged injury resulting from their restriction under the Right of First Refusal/Compensation Rules of Plan B for the 1990 and 1991 seasons. *See, e.g., McNeil v. National Football League*, 790 F.Supp. 871 (D.Minn.1992)

doctrine of collateral estoppel, plaintiffs also contend that they demonstrate a substantial likelihood of success on the merits of their claims, and thus ask the court to grant the requested relief.

## DISCUSSION

■ The court considers four factors when determining whether to issue either a temporary restraining order or preliminary injunction:

1. The probability that the movant will succeed on the merits of its claims;

2. The threat of irreparable harm to the movant if the requested relief is denied;

3. The balance between the harm to the movant if injunctive relief is denied and the injury that will result if such relief is granted; and

4. The public interest.

*Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc) (preliminary injunction); *S.B. McLaughlin & Co. v. Tudor Oaks Condominium Project,* 877 F.2d 707, 708 (8th Cir.1989) (in the Eighth Circuit, courts apply *Dataphase* factors to analyze requests for temporary restraining orders). The court will examine each factor in turn.

### A. *Probability of Success on the Merits*

Plaintiffs rely on the doctrine of collateral estoppel to demonstrate a likelihood of success on the merits of their claims. *See, e.g., Truck Drivers, Local 705 v. Almarc*

(discussing players' antitrust claims challenging the legality of Right of First Refusal/Compensation Rules and also the wage scale proposed under Plan B); *Powell and McNeil v. National Football League,* 764 F.Supp. 1351, 1359 (D.Minn.1991) (discussing underpinnings of *McNeil* litigation).

The *McNeil* case came before the court in a jury trial beginning June 15, 1992. On September 8, 1992, the case was submitted to the jury by way of a special verdict and the jury returned its answers on September 10, 1992. The jury found that the Right of First Refusal/Compensation Rules in Plan B have a substantially harmful effect on competition in the relevant market for the services of professional football players, that those rules significantly contribute to competitive balance in the NFL, but that the rules are more restrictive than reasonably nec-

*Mfg., Inc.,* 553 F.Supp. 1170, 1173 (N.D.Ill. 1982) (considering application of collateral estoppel for purposes of determining likelihood of success on the merits).

■ Collateral estoppel is appropriate where:

1. The issue was identical to one raised in a prior adjudication;

2. There was a final judgment on the merits;

3. The estopped party was a party or in privity with a party to the prior adjudication; and

4. The estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*See, e.g., Oldham v. Pritchett,* 599 F.2d 274, 279 (8th Cir.1979) (citing *Gerrard v. Larsen,* 517 F.2d 1127, 1130 (8th Cir.1975)). In the present case, plaintiffs seek to use the doctrine offensively to prevent the NFL defendants from relitigating the legality of the Plan B rules, an issue that defendants previously lost in the *McNeil* case.[3] In *Parklane Hosiery v. Shore,* the Supreme Court held that the use of offensive collateral estoppel was within the trial court's discretion and emphasized three factors that courts should consider when making that determination:

1. Whether a plaintiff is being rewarded for failing to join in the prior action;

2. Whether the defendants had an incentive to litigate the first action "fully and vigorously"; and

essary to achieve the objective of establishing or maintaining competitive balance in the NFL.

The jury further found that all of the plaintiffs suffered economic injury as a direct result of the Right of First Refusal/Compensation Rules in Plan B, and determined the following monetary damages (before trebling) as a direct result of those rules: Mark Collins, $178,000; Don Majkowski, $0; Tim McDonald, $0; Freeman McNeil, $0; Frank Minnifield, $50,000; Niko Noga, $0; Dave Richards, $240,000; and Lee Rouson, $75,000.

After taking the verdict, the court denied on the record defendants' requests to enter judgment in their favor on the issue of the legality of Plan B and to enter judgment in their favor on the claims of the four players whose monetary damage awards were zero.

3. *See supra* note 2.

3. Whether there are any procedural opportunities available to defendants in the second action that were not available to them in the first action of a "kind that might be likely to cause a different result."

439 U.S. 322, 331–32, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979). Applying those standards, the court finds that it is likely that in the present action, defendants are collaterally estopped from relitigating the legality of the Plan B rules. The issue on which plaintiffs will seek collateral estoppel is identical to that raised in the *McNeil* litigation.[4] The court further notes that the probability of an appeal by defendants in the *McNeil* case does not necessarily preclude the application of collateral estoppel. *See, e.g., In re Ewing*, 852 F.2d 1057, 1060 (8th Cir.1988) ("the pendency of an appeal does not diminish the res judicata effect of a judgment rendered by a federal court", *quoting Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493, 1497–98 (D.D.C.1983) (citations omitted)). Defendants in the present action are also the same parties as in *McNeil*, and were given a full and fair opportunity to litigate the legality of the Plan B rules in *McNeil*.

Turning to the additional factors relevant to offensive use of collateral estoppel, the court determines that such use will not improperly reward plaintiffs for their failure to join in the *McNeil* litigation. The court further concludes that the NFL defendants had significant incentive to fully litigate the legality of the Plan B rules in *McNeil*. Finally, defendants' procedural opportunities are similar to those in *McNeil*, and thus not likely to create a different result in the present action.

■ Even if the court were to determine that the doctrine of collateral estoppel does not apply, the court nonetheless concludes, after hearing all of the evidence and arguments in the *McNeil* case, that plaintiffs demonstrate a substantial probability of success on the merits of their claims. *See,*

*e.g., Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1183–89 (D.D.C.1978) (NFL draft violates Rule of Reason); *Mackey v. National Football League*, 543 F.2d 606, 620–23 (8th Cir.1976) (Rozelle Rule found illegal under Rule of Reason), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Brown v. Pro Football, Inc.*, Civ. No. 90–1071, slip op. at 19–23, 1992 WL 88039 (D.D.C. March 10, 1992) (applying Rule of Reason, and granting plaintiffs' motion for summary judgment concerning defendants' antitrust liability for fixing the wages of developmental squad players in 1989 NFL season); *Kapp v. National Football League*, 390 F.Supp. 73, 82–83 (N.D.Cal. 1974) (NFL draft and Rozelle Rule not justified by Rule of Reason), *judgment aff'd on other grounds*, 586 F.2d 644 (9th Cir. 1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979); *cf. Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1395–98 (9th Cir.) (affirming jury verdict that NFL rule limiting franchise relocation was unreasonable), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *North American Soccer League v. National Football League*, 670 F.2d 1249, 1257–61 (2d Cir.) (overturning district court's decision and holding that NFL's cross-ownership rule violates Rule of Reason), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *United States v. National Football League*, 116 F.Supp. 319, 327 (E.D.Pa.1953) (striking down NFL rules limiting broadcast of games).

Based on the foregoing, the court concludes that this factor tips in favor of granting plaintiffs' motion for injunctive relief.

### B. *Threat of Irreparable Harm*

■ The court also determines that the four players who remain restricted by the Plan B rules make a sufficient showing of irreparable harm because they suffer irreparable injury each week that they remain restricted under an illegal system of player

---

**4.** The issue of the illegality of the Plan B rules also encompasses various other rulings in *McNeil*, for example, the termination of the nonstatutory labor exemption. *Powell and McNeil*

*v. National Football League*, 764 F.Supp. 1351, 1355–59 (D.Minn.1991) (decision only in *McNeil*).

restraints.[5] *See Powell v. National Football League*, 690 F.Supp. 812, 818 (D.Minn. 1988) (stating that it was likely that some players would suffer irreparable injury as a result of restriction under the Plan B rules). Moreover, many of the economic injuries alleged by the players, such as their inability to play for teams that may better utilize their skills, and thus maximize their value, their inability to switch to teams that would allow them to start or that to play on natural grass (which may prolong a player's career), may be impossible to quantify in monetary terms. *See, e.g., Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir.1991) (finding irreparable harm based on professional golfers' allegations that if they were forced to change type of golf clubs, their golf games would suffer, causing "immediately discernible but unquantifiable adverse impact on their earnings, their ability to maintain their eligibility for the [PGA] tour, and for endorsement contracts"); *Allied Marketing Group. Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir.1989) (plaintiffs demonstrate irreparable harm when economic rights are involved and the nature of those rights makes the value of damages difficult to measure in dollars); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984) (citations omitted) (finding of irreparable harm is justified in situations where monetary damages are extremely difficult to calculate). That difficulty is further confirmed by the jury's determination in *McNeil* that despite the existence of economic injury directly caused by the Plan B rules, four players were not able to prove monetary damages to a reasonable degree of certainty.[6] The existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL. *See, e.g., Linseman v. World Hockey*

*Ass'n*, 439 F.Supp. 1315, 1319 (D.Conn. 1977) ("the career of a professional athlete is more limited than that of persons engaged in almost any other occupation. Consequently the loss of even one year of playing time is very detrimental.")[7] Moreover, the threat of irreparable harm has been found, and preliminary injunctive relief prohibiting the application of anticompetitive sports league rules, has been granted in numerous cases involving both professional football and other professional sports. *See, e.g., McCourt v. California Sports*, 460 F.Supp. 904, 912 (E.D.Mich. 1978) (enjoining operation of player reserve system and finding that hockey player suffered irreparable harm when he was traded as compensation for another player), *vacated on other grounds*, 600 F.2d 1193 (6th Cir.1979); *Linseman*, 439 F.Supp. at 1319–20 (granting injunctive relief and finding that money could not adequately compensate player for the loss of his ability to play professional hockey for one season); *Bowman v. National Football League*, 402 F.Supp. 754, 756 (D.Minn.1975) (recognizing players suffered irreparable harm when the NFL's boycott of former World Football League players prevented them from playing); *Denver Rockets v. All–Pro Management, Inc.*, 325 F.Supp. 1049, 1057 (C.D.Cal.1971) (enjoining NBA rule that prohibited players from signing with NBA until four years after high school graduation and recognizing that "a professional basketball player has a very limited career").

Based on the foregoing, the court concludes that the four players who remain restricted under the Plan B rules have adequately demonstrated a threat of irreparable harm. *See Powell*, 690 F.Supp. at 818.

### C. *Balance of Harm Between the Parties*

■ Defendants contend that if the court grants the requested injunctive relief,

---

**5.** Those four players are Keith Jackson, Webster Slaughter, D.J. Dozier, and Garin Veris. Plaintiffs concede that the remaining six players are unable to demonstrate a threat of irreparable harm unless defendants impose another system like Plan B, in which case the two players who are currently without contracts may again be subject to some system of restraint.

**6.** *See supra* note 2 (detailing jury's findings in *McNeil*).

**7.** That conclusion is further supported by testimony in the *McNeil* case.

competitive balance between the NFL teams will suffer.[8] They also argue that such relief will significantly injure the teams that are currently restricting the remaining four players.[9] They claim that if the court were to grant a temporary restraining order, the four teams may incur harm resulting from the loss of the four players' services.[10] The court notes, however, that if the four players do change teams, such trades will likely have little impact on the overall competitive balance of the league.[11] Moreover, defendants have no justifiable interest in continuing to violate the Sherman Act by preserving an illegal status quo. In balancing any hardship to defendants against plaintiffs' harm if the requested relief is denied, the court finds that plaintiffs stand to suffer the greater harm and thus this factor favors injunctive relief.

### D. *The Public Interest*

The court finally concludes that the public interest strongly favors the granting of plaintiffs' injunctive relief because such relief fosters the policies underlying the Sherman Act and does not undermine the policies of labor law. Moreover,

although mandatory injunctive relief is rarely granted absent compelling circumstances, the court finds that this case presents such compelling circumstances, and that granting such relief may encourage, rather than stifle, settlement. *See, e.g., Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289, 1299 (10th Cir.1980) ("[i]t is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedy not favored by the courts"), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981).

Defendants also contend that the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15, bars any injunctive relief in the present case. That Act limits federal courts' jurisdiction to issue injunctive relief in cases "involving or growing out of a labor dispute" and specifically prohibits any injunctive relief "contrary to the public policy declared" in the Act.[12] 29 U.S.C. § 101. The Act defines public policy in "labor matters" as follows:

Whereas under prevailing economic conditions, developed with the aid of govern-

---

**8.** As the court instructed the jury in the *McNeil* case:

> According to defendants, competitive balance means that all of the NFL teams are of sufficiently comparable playing strength to provide competitive and high quality games that are close, exciting and well-played, and thus interesting to fans.

*McNeil* Jury Instruction No. 19.

**9.** Those four teams are the Philadelphia Eagles, the Detroit Lions, the Cleveland Browns and the New England Patriots.

**10.** Those four football clubs, however, are currently without the services of those four players.

**11.** The court acknowledges that the impact may be more severe on four individual teams, but notes that those teams may still be able to negotiate and sign the players after injunctive relief is granted. Moreover, as the court determined in *McCourt* when evaluating the balance of harms that would flow from enjoining the reserve system in professional hockey:

> no [team] is threatened with an injury comparable to [a player's] irreparable harm [if restrained]. The Los Angeles Kings and the California Sports, Inc., have argued valiantly,

but unpersuasively, that to deny them [a player's] services will damage their franchise, that the team will be less proficient, that their record as a team and their reputation in the community will be seriously damaged and that they have already lost the sale of a large number of season tickets.... Defendants may not recover for their inability or their refusal to renew [a player's] contract through the operation of a provision that violates the antitrust law. Any injury that [a team] may suffer could have been avoided by exercising a greater effort to retain the services of [a player].

460 F.Supp. at 912, *vacated on other grounds,* 600 F.2d 1193 (6th Cir.1979).

**12.** The Norris–LaGuardia Act also prohibits the enjoining of various enumerated activities, none of which are at issue in the present case. *See* 29 U.S.C. § 104; *H.A. Artists & Assoc., Inc. v. Actors' Equity Ass'n,* 451 U.S. 704, 714, 101 S.Ct. 2102, 2108, 68 L.Ed.2d 558 (1981) (Norris–LaGuardia Act "prohibits federal-court injunctions *against single or organized employees* engaged in enumerated activities") (emphasis added); I Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 229b, at 191 (1978) (Act protects those activities "which employees and unions conduct unilaterally in pursuit of their goals").

mental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

*Id.* § 102. Thus, the Act seeks to protect: the rights of employees to organize into unions and to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection.' *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 325 U.S. 797, 805, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945) (quoting Act). Based on the court's determination in *McNeil* that any bargaining relationship between players and defendants ended no later than November, 1989, *Powell and McNeil v. National Football League,* 764 F.Supp. 1351, 1358–59 (D.Minn.1991) (holding only in *McNeil*) and that the Plan B rules were thereafter subject to antitrust challenge, *id.* at 1359, the court determines that the Act does not preclude injunctive relief in the present case because such relief will not undermine any labor policy set forth in the Act. *See Los Angeles Meat & Provision Drivers Union, Local 626 v. United States,* 371 U.S. 94, 99–102, 83 S.Ct. 162, 165–167, 9 L.Ed.2d 150 (1962) (Norris–LaGuardia Act does not prohibit injunctive relief where labor union conspires with employer to violate the Sherman Act because such an illegal combination to restrain competition does not grow out of a labor dispute); *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867, 880 (S.D.N.Y.1975) (rejecting as "patently meritless" argument that Norris–LaGuardia Act should be used to dissolve injunction that prevented the merger of two rival professional basketball leagues because Act "did not apply to an antitrust case"); *Nassau Sports v. Peters,* 352 F.Supp. 870, 882 (E.D.N.Y.1972) (Act did not apply to dispute between hockey player and hockey club because player's contract was one for "unique personal services to be rendered by an individual", and thus did not involve either a labor dispute or labor contract); *Flood v. Kuhn,* 316 F.Supp. 271, 280 n. 15 (S.D.N.Y.1970) (Act did not apply to action by baseball player challenging professional baseball's reserve system); *cf. Mackey,* 543 F.2d at 623 (upholding permanent injunctive relief based on determination that Rozelle Rule violated the Rule of Reason, and stating that it was unclear whether case presented a labor dispute as defined by the Act).

Denying injunctive relief in the present case may actually subvert the labor policies set forth in the Act. As the court previously stated, the players sacrificed their union representation and the protection of the labor laws to pursue their antitrust remedies. *Powell and McNeil,* 764 F.Supp. at 1355–59 (decision in *McNeil*).[13] It would be ironic if a statute that had been enacted to protect the rights of individual employees from improper actions by employers and the courts were turned against those employees and used to justify the continued application of a system found illegal under the Sherman Act. *Cf. United States v. Women's Sportswear Mfg. Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949) (reversing denial of govern-

13. For example, the players:
   have ... paid a price for the loss of their collective bargaining representative because the NFL defendants have unilaterally changed

insurance benefits and lengthened the [football] season ...
   *Powell and McNeil,* 764 F.Supp. at 1359 (discussing motion in *McNeil*).

ment's request for antitrust injunctive relief involving activities of unincorporated trade association because "benefits to organized labor cannot be utilized as a cat's-paw to pull employers' chestnuts out of the antitrust fires").[14]

Defendants also rely on prior rulings by this court in *Powell v. National Football League* to support their contentions.[15] Although this court previously held that the Act barred injunctive relief in the *Powell* litigation, that decision reflected the court's determination that:

> granting the players a preliminary injunction to secure unrestricted free agency would wholly subvert the collective bargaining process and thereby offend a central purpose of the Norris–LaGuardia Act.

690 F.Supp. at 817. As previously noted, denying injunctive relief in the present case may actually undermine the policies underlying the Act.

In denying injunctive relief in *Powell*, the court further reasoned that:

> [I]t would be highly destructive to collective bargaining if major issues could be removed from the bargaining table and preliminarily resolved in isolation in antitrust litigation.

*Id.* Moreover, the court specifically limited its decision in *Powell*, stating that the determination did:

not provide the system of player restraints extended immunity to the antitrust laws. The Court's ruling merely denies injunctive enforcement of the antitrust laws until after a final resolution on the merits.

*Id.* at 817 n. 9. The present case, however, is clearly distinguishable from *Powell* as a result of the court's subsequent determination that the nonstatutory labor exemption terminated after the players abandoned their union, *Powell and McNeil*, 764 F.Supp. at 1355–58 (ruling only in *McNeil*), and the finding in *McNeil* that the Plan B rules violated the Sherman Act.[16]

Based on the foregoing, the court concludes that granting the requested injunctive relief is not "contrary to the public policy" declared in the Norris–LaGuardia Act, and thus the Act does not preclude such relief.

■ Even if the court were to apply the Act to the present case, injunctive relief may still issue based on an evaluation of the traditional factors underlying such relief: the threat of substantial and irreparable harm to movant's property, the existence of no adequate remedy at law and the balance of harms favoring injunctive relief. *See* 29 U.S.C. § 107; *see supra* analyzing same factors under *Dataphase*. The Act further requires that "unlawful acts have been threatened or will be committed unless restrained." The court con-

**14.** The court further finds that defendants' reliance on *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prod., Inc.*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), is misplaced. In *Milk Wagon*, the Supreme Court held that federal courts do not have jurisdiction to grant injunctive relief merely because the parties allege violations of the Sherman Act. *Id.* at 103, 61 S.Ct. at 128 (no exception recognized "merely because alleged violations of the Sherman Act are involved" because such an exception would undermine the labor policies protected by the Norris–LaGuardia Act). In the present case, plaintiffs seek to rely on a prior decision that established a violation of the Sherman Act, and thus constitutes much more than a mere allegation of such illegality. Moreover, the Supreme Court has recognized that the Norris–LaGuardia Act does not preclude injunctive relief for certain antitrust challenges, such as a situation where a union has conspired with a non-labor group, like an employer or other business group, to violate the Sherman Act. *See, e.g., Los*

*Angeles Meat & Provision Drivers Union*, 371 U.S. at 99–100, 83 S.Ct. at 165 (it is "beyond question that nothing in the anti-injunction provisions of the Norris–LaGuardia Act ... insulates a combination in illegal restraint of trade between businessmen and a labor union from the sanctions of the antitrust laws", *citing Allen Bradley Co.*, 325 U.S. at 809, 65 S.Ct. at 1539). If the Act does not provide a statutory exemption for a conspiracy between a labor union and an employer to violate the antitrust laws, it is difficult to understand why the Act would insulate such a conspiracy between employers.

**15.** The *Powell* litigation involved "a class action challenging player restraints as far back as 1987, including allegations of abuse of monopoly power under Section 2 of the Sherman Act, a challenged to the uniform player contract" and the Right of First Refusal/Compensation Rules of Plan B. *Powell*, 764 F.Supp. at 1359.

**16.** *See supra* note 2.

cludes that in light of the *McNeil* case, this requirement has clearly been met. The Act also requires an evidentiary hearing before such relief may issue. Although defendants may argue to the contrary, it is undisputed that they received a full jury trial on the legality of Plan B, and numerous hearings on the labor exemption issue. The court thus concludes that the requirement for a "hearing" has been satisfied for purposes of issuing a temporary restraining order. The court finally concludes there are no public officials whose duties are relevant to the present dispute. Thus, the court determines that the Act does not bar plaintiffs' request for a temporary restraining order.

Accordingly, IT IS HEREBY ORDERED that:

1. All defendants are temporarily enjoined, for a period of five days from the date of this order, from enforcing the Right of First Refusal/Compensation Rules of Plan B against plaintiffs Keith Jackson, Webster Slaughter, D.J. Dozier, and Garin Veris;

2. All defendants are temporarily enjoined, for a period of five days from the date of this order, from enforcing any other rules or agreements that restrict plaintiffs Keith Jackson, Webster Slaughter, D.J. Dozier, and Garin Veris from freely negotiating and entering into contracts with any NFL club for the 1992 NFL season;

3. This order shall be effective upon plaintiffs' filing with the court one $10,000 bond, pursuant to Federal Rule of Civil Procedure 65(c), for the payment of such costs and damages as may be incurred by defendants if it should be determined that defendants have been wrongfully enjoined; and

4. The court will defer ruling on plaintiffs' motion for preliminary injunctive relief until after it conducts an evidentiary hearing on that matter. The evidentiary hearing shall be held on September 29, 1992, at 1:30 p.m.